## BERNICE JOHNSON AND OTHERS v. LaGRANGE SHOE CORPORATION.
## COMMISSIONER, DEPARTMENT OF EMPLOYMENT SECURITY, RESPONDENT.[1]

April 22, 1955.

No. 36,381.

*Francis X. Helgesen* and *Helgesen & Kane,* for relators.

*Miles Lord,* Attorney General, and *K. D. Stalland,* Assistant Attorney General, for commissioner-respondent.

[1] Reported in 70 N. W. (2d) 335.

KNUTSON, JUSTICE.

Certiorari to review a decision of the division of employment security denying unemployment benefits.

The facts are not in dispute. LaGrange Shoe Corporation owns and operates a shoe factory in Red Wing, Minnesota. At the time here involved it employed about 150 production and maintenance employees. The United Shoe Workers of America, CIO, Local No. 211, was the sole bargaining agent for all such employees. Of the 150 employees, all except 18 were members of the union. Of the claimants here involved, all but four were members of the union. On September 17, 1952, the company and the union entered into a collective-bargaining contract which was to expire on October 20, 1953, covering wages, working conditions, and other terms and conditions of employment. With respect to vacations, the contract contains the following provisions:

"The Company agrees to give to each Employee with more than one year's continuous service as of June 30th, 1953, one weeks vacation with pay; such vacation pay to be figured as forty hours times the average hourly earnings exclusive of any overtime payments for each Employee for the F. I. C. A. accounting period ending March 31st. Vacation pay so figured shall be paid prior to the vacation period.

"The Company also agrees to give Employees with more than five years continuous service, two consecutive weeks vacation with pay; such vacation pay to be figured the same as the first week vacation pay, and shall be paid prior to the vacation period.

"It is further agreed that the vacation weeks shall be during the Red Wing Public School Summer Vacation dates, with the exact weeks to be specified by the Company thirty days in advance of the actual vacation period.

"During the month of February, all those Employees entitled to the two weeks vacation, and who are desirous of actually having the two weeks time off, shall notify the Company of their wishes. Within one week after the actual vacation dates have been announced, the Company shall have the opportunity of trying to work out satisfactory vacation dates with the Employees who have signified their

desire to take the two weeks off, or, in the interest of production needs, to discourage these Employees from taking two weeks off. Failure of the Employer to convince the Employee shall in no way prohibit the Employee from taking their second week's vacation.

"It is agreed that any Employee discharged for cause or any Employee quitting the employ of the Company prior to June 30th of the vacation year, shall forfeit all claims to any vacation pay.

"For purposes of this paragraph, continuous service is defined as any Employee who was employed on June 30th of the previous year and who received wages in thirty-six of the fifty-two weeks in the fiscal year. Leaves of absence not to exceed thirty days, and absences caused by sickness or other illness not to exceed three months shall not be cause for break in continuous service."

In February 1953, pursuant to this contract, the company posted a notice requesting that employees wishing to take a two-week vacation notify it of their desires. From 80 to 90 percent of the employees so notified the company. Thereafter, the company gave timely notice that it would close the plant for vacation purposes from June 22 through July 5. The nature of the company's production is such that it could not operate with such a large percentage of its employees on vacation. During the past seven years the company has closed down for vacation, although in 1952 it closed down for only one week. Fourteen of the company's employees who were entitled to only one week vacation with pay and five who qualified for no vacation with pay under the contract filed claims for unemployment benefits. The claims were disallowed and, after the usual administrative appeals, are here on certiorari to review the final decision of the commissioner.

Many of the questions involved here were determined in Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449. It is the contention of relators (1) that subsequent events have so eroded the Honeywell case as to render it untenable or lacking in authority; (2) that if the Honeywell case is adhered to it is not controlling here; and (3) that the policy of our unemployment compensation statute will be vindicated by awarding claimants benefits for their period of unemployment.

■ In deciding the Honeywell case, we discussed and followed the cases of In re Employees of Buffelen Lbr. & Mfg. Co. 32 Wash. (2d) 205, 201 P. (2d) 194; Moen v. Director of Div. of Employment Security, 324 Mass. 246, 85 N. E. (2d) 779, 8 A. L. R. (2d) 429; Mattey v. Unemployment Comp. Board, 164 Pa. Super. 36, 63 A. (2d) 429; and Paden City Pottery Co. v. Board of Review (Cir. Ct.) 8 CCH, Unemployment Ins. Rep. W. Va. par. 8090.

Relators now contend that those cases are no longer authority in the states where they have their origin. The state of Washington, by statute, has adopted a rule contrary to the decision of its court in the Buffelen case.[2] Massachusetts, by statute, likewise has adopted a rule contrary to the Moen case.[3]

In West Virginia the legislature apparently adopted the same rule followed by the court in its decision in the Paden case.[4] Since the decision in the Paden case, the West Virginia court also has had occasion to reconsider the entire matter in Bennett v. Hix (W. Va.) 79 S. E. (2d) 114. See, also, the decision of the circuit court in the thirteenth judicial circuit at Charleston, West Virginia, in Sylvania Elec. Products Co. v. Appeal Board, 8 CCH, Unemployment Ins. Rep. W. Va. par. 8134.

Relators contend that the Pennsylvania court has rejected its decision in the Mattey case in the later case of Golubski Unemploy-

[2] "* * * the cessation of operations by an employer for the purpose of granting vacations, whether by union contract or other reasons, shall in no manner be construed to be a voluntary quit nor a voluntary unemployment on the part of the employees." Rev. Code of Wash. 50.20.115.

[3] "* * * An individual who is not entitled to vacation pay from his employer shall be deemed to be in total unemployment during the entire period of any general closing of his employer's place of business for vacation purposes, notwithstanding his prior assent, direct or indirect, to the establishment of such vacation period by his employer." Ann. Laws of Mass. c. 151A, § 1 (r) (2).

[4] "* * * an individual shall be disqualified for benefits: ·

* * * * *

"For each week in which he is unemployed because of his request or that of his duly authorized agent for a vacation period at a specified time that would leave the employer no other alternative but to suspend operations." W. Va. Code 1949 Ann. § 2366 (78) (8).

ment Comp. Case, 171 Pa. Super. 634, 91 A. (2d) 315. A review of the later Pennsylvania cases shows this to be erroneous. In Philco Corp. v. Unemployment Comp. Board, 175 Pa. Super. 402, 105 A. (2d) 176, the Mattey and Golubski cases are distinguished and the Mattey case is reaffirmed. In the still later case of General Elec. Co. v. Unemployment Comp. Board, 177 Pa. Super. 49, 110 A. (2d) 258, the Golubski case is again distinguished and the Mattey and Philco cases followed.

Since our decision in the Honeywell case our attention has been called to the case of Matter of Rakowski, 276 App. Div. 625, 97 N. Y. S. (2d) 309; and other courts have adopted the same view. Matter of Naylor, 281 App. Div. 721, 117 N. Y. S. (2d) 775, affirmed, 306 N. Y. 794, 118 N. E. (2d) 816; In re Gerlach (S. Ct. App. Div.) CCH, Unemployment Ins. Rep. N. Y. par. 8936; Beaman v. Bench, 75 Ariz. 345, 256 P. (2d) 721.

Several lower courts also have followed the same rule. See, Collopy v. Porter (Ct. of Common Pleas) 6 CCH, Unemployment Ins. Rep. Ohio, par. 8260; Cambridge Glass Co. v. Bureau of Unemployment Comp. (Ct. of Appeals) 6 CCH, Unemployment Ins. Rep. Ohio, par. 8411; I. M. Dach Underwear Co. v. Employment Security Comm. (Cir. Ct.) 4 CCH, Unemployment Ins. Rep. Mich. par. 8445; Elliott v. Bureau of Unemployment Comp. (Ct. of Common Pleas) 6 CCH, Unemployment Ins. Rep. Ohio, par. 8384.

We see no reason for disturbing our decision in the Honeywell case. Our legislature has had a full session since that decision and is now again in session. If our decision correctly construed our statute in the Honeywell case, which we believe it did, it is as sound now as it was then. If the statute is to be amended, it should be left to the legislature to do so as it did in Washington and Massachusetts.

Relators next contend that the facts in the case now before us differ from those in the Honeywell case to such an extent that the decision in that case is not authority for denying compensation benefits here. The contract in the Honeywell case contains the following provision (234 Minn. 54, 47 N. W. [2d] 450):

"The Company shall have the option to establish a vacation shutdown between June 1st and August 30th of the then current year. *All employees* shall take time off equal to the established length of the vacation shutdown, except those employees the Company may require to work during the vacation shutdown."

In the case now before us the contract does not expressly state that all employees shall take time off during the vacation shutdown, nor does it expressly state that the company may shut down the plant for vacations. It must be assumed, however, that the union, acting as agent for the employees, was familiar with the custom of the company of closing down for vacations during previous years. In construing a collective-bargaining contract of this kind, we must do so with some semblance of realism. Collective-bargaining contracts of this kind today are negotiated by representatives of both union and employer who are thoroughly familiar with their work and with the law applicable to such contracts. Here the evidence is conclusive that the plant could not operate with 80 to 90 percent of its production force on vacation. The main distinction between the two contracts is that in the Honeywell case the company had the option of closing the plant. Here the employees, by signifying their desire to take a vacation in such large numbers as to make it impossible to operate the plant, had in effect the option to force a shutdown. To hold that under this contract the parties did not contemplate a shutdown in view of the past experience in that regard, when so many employees chose to take vacations as to make it imposssible to operate, simply ignores that which must be apparent to everyone. It would seem to us that in view of our decision in the Honeywell case, if the union had intended that the company should furnish employment for those employees not entitled to vacation pay during a shutdown, even though the plant could not operate, it would have been a simple matter so to provide in the contract. It would seem, if that had been the intention of the parties, that the contract would have provided paid vacations for all employees. Provisions granting paid vacations to employees who meet certain specified qualifications and not to others would seem to negate such construction of

the contract. With respect to the vacation period, this contract contains the following provision:

"It is further agreed that the vacation weeks shall be during the Red Wing Public School Summer Vacation dates, with the exact weeks to be specified by the Company thirty days in advance *of the actual vacation period.*" (Italics supplied.)

The contract speaks of the vacation period in the singular. This hardly could contemplate anything but that all vacations should be taken at the same time. We believe that the only fair construction of this contract in the light of the past experience is that, when such a large percentage of the employees exercised their right to take vacations as to make it impossible to operate the plant, the company had the right to close down during the period specified in the contract and that our decision in the Honeywell case controls the rights of those employees not entitled to vacation pay.

■ Under the rules of construction pertaining to unemployment laws, relators contend that benefits should be awarded to these claimants. In Nordling v. Ford Motor Co. 231 Minn. 68, 76, 42 N. W. (2d) 576, 581, 28 A. L. R. (2d) 272, we stated the rules applicable to construction of our unemployment laws to be as follows:

"Unemployment compensation statutes were enacted during a period of distress and were designed to relieve the hardship caused by unemployment due to no fault of the employe. The legislative purpose behind the enactment of our act is to be found in the legislative declaration of public policy, § 268.03. It is a general rule that a liberal construction is usually accorded statutes which are regarded by courts as humanitarian or which are grounded on a humane public policy. * * * Where there are disqualifying provisions, the exceptions should be narrowly construed. But these rules of construction do not mean that we are at liberty to put something into the statute which is not there. Our function, guided by ordinary rules of construction, is to ascertain, if we can, what the legislative intent was and to give effect to it."

For a history and nature of our act, see Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223.

Were it not for the statutory definition of "unemployed,"[5] it would be doubtful if it could be said that an employee on vacation is unemployed at all. Certainly he retains all rights incident to his employment status. The statute limits our consideration, however, to the question whether he is voluntarily or involuntarily unemployed. Where he has agreed, through the medium of his bargaining agent, directly or by implication, that the plant may close down during a vacation period, we think that under our rule of construction it should be held that he is voluntarily unemployed or, more strictly speaking, on a leave of absence.

The contra cases relied on in the dissenting opinion are distinguishable either on the facts or the law. Some of the cases are distinguished in Beaman v. Bench, 75 Ariz. 345, 256 P. (2d) 721. In some of the cases the court writing the opinion has distinguished its case from our Honeywell case. In Schettino v. Administrator, 138 Conn. 253, 257, 83 A. (2d) 217, 219, the Connecticut court said:

"* * * This case [Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449] appears to have been decided upon the authority of cases arising under the Washington, Pennsylvania, West Virginia and Massachusetts statutes. These statutes, in terms, disqualify plaintiffs who 'voluntarily' leave their employment. The difference in the wording of these statutes from that of our own (§ 7508[2][a]) necessarily affects the reasoning in those opinions. The test of 'voluntarily' leaving therein discussed and applied is not the test applied in this state."

In American Bridge Co. v. Review Board, 121 Ind. App. 576, 580, 98 N. E. (2d) 193, 195, in discussing some of the cases cited by us with approval in the Honeywell case, the Indiana court said:

"All of the foregoing cases are clearly distinguishable from the case at bar. In the instant case there is no question but that the

---

[5]See, Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449.

shutdown occurred as a result of voluntary action of the company *for the purpose of taking inventory,* and as stated in the notice, insofar as possible, the period will be designated for vacations. By the use of the words 'insofar as possible, this period will be designated for vacations' the company does not show a clear and unequivocal intention to declare vacations for all. By reason of the terms of the employment contract with the union, such period could only be designated for employees of the plant who were eligible for vacations." (Italics supplied.)

Apparently the dissent overlooks the distinction drawn by Pennsylvania's own courts between Golubski Unemployment Comp. Case, 171 Pa. Super. 634, 91 A. (2d) 315, and the other Pennsylvania cases discussed above. Nor does the student note in 36 Minn. L. Rev. 426 furnish any authority for the dissent. That note criticizes our decision in the Honeywell case. The dissent apparently accepts the decision in the Honeywell case but seeks to distinguish it on the facts from the instant case. It is difficult to see how the law review note, even if we accept it as authority, could be of any help in sustaining the position of the dissent.

Affirmed.

THOMAS GALLAGHER, JUSTICE (dissenting).

I am of the opinion that the terms of the contract in the instant case differ from those of the contract in Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449, to such an extent that the latter cannot be said to be controlling. In the Honeywell case the company and the union agreed by their contract that the company *"shall have the option to establish a vacation shutdown* between June 1st and August 30th of the then current year" (italics supplied) and that *"All employees* shall take time off equal to the established length of the vacation shutdown, except those employees the Company may require to work * * *." Our decision there was based exclusively on this language in the contract. With reference thereto we stated (234 Minn. 54, 57, 61, 47 N. W. [2d] 450, 452, 454):

"This provision * * * uses *mandatory* language and covers *all* employes, * * *.

\* \* \* \* \*

"This case thus narrows down to the proposition whether Jackson's [the employee] unemployment * * * was * * * involuntary. * * * *Absent this contract, there is no evidence of voluntary unemployment.* * * *

\* \* \* \* \*

"* * * Jackson's unemployment must be considered voluntary in view of the union contract * * *." (Italics supplied.)

In support thereof, we cited In re Employees of Buffelen Lbr. & Mfg. Co. 32 Wash. (2d) 205, 201 P. (2d) 194; Moen v. Director of Div. of Employment Security, 324 Mass. 246, 85 N. E. (2d) 779, 8 A. L. R. (2d) 429; Mattey v. Unemployment Comp. Board, 164 Pa. Super. 36, 39, 63 A. (2d) 429, 431; Paden City Pottery Co. v. Board of Review (Cir. Ct.) 8 CCH, Unemployment Ins. Rep. W. Va. par. 8090.

■ In each of such cases, as in the Honeywell case, to render a claimant eligible for unemployment benefits under the statutes involved, his unemployment must have been involuntary, and in each thereof, as in the Honeywell case, contract provisions for plant shutdowns or positive union requests therefor were held indicative of the employees' consent that their vacations be taken while the shutdown was in effect.

■ Other decisions cited in the majority opinion in which unemployment benefits were denied almost without exception were based upon like contractural provisions or union requests. Thus, in Matter of Rakowski, 276 App. Div. 625, 97 N. Y. S. (2d) 309, the union, representing all employees, requested that the plant be closed for vacation purpose for *all* employees. In Matter of Naylor, 281 App. Div. 721, 117 N. Y. S. (2d) 775, affirmed, 306 N. Y. 794, 118 N. E. (2d) 816, the contract provided that when operations permitted closing of the plant "all vacations will be taken" then. A letter from the union requesting such closing for vacation purposes was held to indicate that a subsequent shutdown was at the union's

request. In re Gerlach (S. Ct. App. Div.) CCH, Unemployment Ins. Rep. N. Y. par. 8936, the contract provided the company might shut down for two weeks if thirty days' notice to such effect were given. In Philco Corp. v. Unemployment Comp. Board, 175 Pa. Super. 402, 105 A. (2d) 176, contract provisions reserved to the company an option for a plant shutdown and thus, in the court's opinion, distinguished the situation from that involved in Golubski Unemployment Comp. Case, 171 Pa. Super. 634, 91 A. (2d) 315, where compensation benefits were allowed because of the absence of such contract provisions. In I. M. Dach Underwear Co. v. Employment Security Comm. (Cir. Ct.) 4 CCH, Unemployment Ins. Rep. Mich. par. 8445, the court disqualified employees because of a contract provision that "All vacations shall be taken during the week in which July 4th shall fall and the week immediately following," which the court construed as an agreement for voluntary unemployment during such period.

■ One appellate court gives support to the viewpoint of the the majority. The Arizona supreme court, in Beaman v. Bench, 75 Ariz. 345, 256 P. (2d) 721, denied unemployment benefits occasioned by a plant shutdown although no reservation therefor was contained in the contract. There the court found, however, that the *union* had proposed that all earned two-week vacations be taken either at times desired by individual employees or in the alternative that all employees take their vacations at the same time during July; that the company had thereupon advised the union that either alternative would necessitate a plant shutdown; and that the union representative had responded that he was cognizant that that might be the result. In giving support to its decision, the court noted the distinction between (75 Ariz. 349, 256 P. [2d] 724) "shutdowns forced by virtue of the terms of the contract and those which are wholly at the employer's option," clearly indicating that only the former would disqualify an employee from compensation benefits.

Apart from this decision, a few decisions of the lower Ohio court lend doubtful support to the majority viewpoint. Collopy v. Porter (Ct. of Common Pleas) 6 CCH, Unemployment Ins. Rep. Ohio, par.

8260; Cambridge Glass Co. v. Bureau of Unemployment Comp. (Ct. of Appeals) 6 CCH, Unemployment Ins. Rep. Ohio, par. 8411; Elliott v. Bureau of Unemployment Comp. (Ct. of Common Pleas) 6 CCH, Unemployment Ins. Rep. Ohio, par. 8384.

■ The situation presented here is analogous to that in Golubski Unemployment Comp. Case, *supra,* where the contract reserved to the company the right to a shutdown during which *employees eligible for vacations with pay* were required to take their vacations. There the court determined that employees not within this class but who were required to "lay off" during the shutdown could not be said to be voluntarily unemployed during such period. In referring to the prior Pennsylvania case, Mattey v. Unemployment Comp. Board, *supra,* cited in the Honeywell decision, the Pennsylvania court stated (171 Pa. Super. 638, 91 A. [2d] 317):

"* * * that case is clearly distinguishable. * * * In the instant case the claimants never agreed that they should be laid off for two weeks, * * *. If it [the shutdown] did occur the men agreed only to apply their paid vacation to the two weeks shutdown. The employes were available for work and their failure to work was because the employer furnished no work."

In two later cases, Philco Corp. v. Unemployment Comp. Board, *supra,* and General Elec. Co. v. Unemployment Comp. Board, 177 Pa. Super. 49, 110 A. (2d) 258, the Pennsylvania court again clearly recognized the difference between situations such as those involved in the Mattey case and those in the Golubski case and reaffirmed the correctness of its rule when applied to facts such as were present in the latter.

In American Bridge Co. v. Review Board, 121 Ind. App. 576, 98 N. E. (2d) 193, the Indiana appellate court recognized differing principles involved in these distinctive situations. There the contract reserved to the company the right of a temporary shutdown between certain dates which might be designated as the vacation period for employees eligible for vacations with pay. In holding that such provisions did not disqualify employees not within the eligible

class, the Indiana court stated (121 Ind. App. 580, 98 N. E. [2d] 195):

"* * * there is no question but that the shutdown occurred as a result of voluntary action of the company for the purpose of taking inventory, and as stated in the notice, insofar as possible, the period will be designated for vacations. * * * By reason of the terms of the employment contract with the union, such period could only be designated for employees of the plant who were eligible for vacations.

*   *   *   *   *

"* * * There is nothing within the provisions of the union contract which would give rise, even inferentially, to a reasonable construction that employees who were not eligible for vacations were affected in any way by the designation of the vacation period for eligible employees. Certainly, the employees who were not eligible for vacation have not by any reasonable interpretation to be placed upon the terms * * * of the bargaining agreement consented to any action by the company which would permit the designation of a period of vacation without pay for them."

In Schettino v. Administrator, 138 Conn. 253, 83 A. (2d) 217, under the contract certain employees were eligible for one week's vacation with pay, and the company had reserved the right to a plant shutdown during the week it would designate for such vacation. There it was held that a shutdown beyond this one week qualified all such employees for unemployment benefits for the period following that of the paid vacation week. While the decision was in part based upon a somewhat dissimilar Connecticut statute, the court clearly expressed the principle which should be applicable in the instant case in its statement that (138 Conn. 258, 83 A. [2d] 219):

"* * * The essence of the agreement entered into between the union acting as the agent of the plaintiff and the company was, so far as it affected the plaintiff, nothing more than that he should have one week's vacation with pay and that the company should have the right to designate as that week one of the weeks during which it might be shut down for other purposes. It did not amount to a vol-

untary relinquishment by him of his employment during the second and subsequent weeks of shutdown."

In Glover v. Simmons Co. (Super. Ct. App. Div.) 5 CCH, Unemployment Ins. Rep. N. J. par. 8248, the agreement provided for paid vacations of one week for employees with one to five years of service; two weeks for those with five years or more; and three weeks for those with at least 15 years' employment. It was stipulated therein that employees entitled to one week would take this week beginning July 6; that those entitled to two weeks would be off duty for two weeks beginning July 6; while those entitled to three weeks would take the first two during the same two weeks of July and the third at a time to be selected by management. A plant shutdown was ordered for July 6. An employee who had been employed for less than a year and was not qualified for a vacation with pay sought unemployment benefits because thereof. Upholding his claim therefor, the New Jersey court stated:

"* * * if there were no contract with the union and the employer closed the plant in order to effectuate a policy of giving vacations to employees with a year's service, unqualified employees would be involuntarily unemployed during the shutdown period * * *."

While the New Jersey court's decision hinged upon a statutory prohibition against waiver of unemployment benefits, the court there stated:

"Our conclusion would be the same even if the statute did not contain the non-waiver provision. * * * Some [courts] take the position that persons who do not meet the contract requirements for vacation are voluntarily unemployed because they consented through their union to the plant shutdown. Others take the more realistic view that employees without right to vacation under the contract are out of work through no fault of their own * * *. We believe that the latter view is more consonant with the spirit of our unemployment compensation law."

See, Hubbard v. Unemployment Comp. Comm. 328 Mich. 444, 44 N. W. (2d) 4. The principles above expressed seem clearly appli-

cable to the facts in the instant case. See, 36 Minn. L. Rev. 426; Annotation, 30 A. L. R. (2d) 366.

■ That the distinctive factual situations which give rise to the two lines of authority above referred to distinguish the instant case from the Honeywell case appears conceded by the majority opinion. There it is stated:

"In the case now before us the contract does not expressly state that all employees shall take time off during the vacation shutdown, nor does it expressly state that the company may shut down the plant for vacations. * * * The main distinction between the two contracts is that in the Honeywell case the company had the option of closing the plant."

That this factor formed the sole basis for the Honeywell decision is clearly manifested by the language therein that (234 Minn. 57, 47 N. W. [2d] 452) "Absent this contract, there is no evidence of voluntary unemployment." This limitation is sought to be avoided in the majority opinion by the statement that the employees, by signifying in large number their intentions of taking their vacations as authorized by the contract, in effect, exercised "the option to force a shutdown." But the company must have contemplated that employees entitled thereto would seek their vacations during the period specified therefor, and had it desired it could have reserved shutdown privileges by reason thereof. However, it reserved only the right of "trying to work out satisfactory vacation dates" with employees entitled to two weeks' paid vacation. With the express contract provisions in mind, how can the exercise of a right granted thereby be construed as union authorization of a plant shutdown?

Likewise, there does not appear any basis for the suggestion that in view of the Honeywell case, if the union had intended that the company furnish employment during a plant shutdown for employees not entitled to vacations, it should have so provided. The very significant statement in the Honeywell case that "Absent this contract [with shutdown privileges reserved to the company] there is no evidence of voluntary unemployment" quite definitely forecloses this contention. Rather, such language would clearly impose upon the

company the burden of inserting a contract provision for plant shut-down during vacation period if it wished safeguards therefor. The contract is clear and contains no such reservation. It should not be subjected to a construction which by implication adds to it the feature which formed the sole basis for the Honeywell decision.