MURRAY ANSON AND ANOTHER v. FISHER AMUSEMENT
CORPORATION.

93 N. W. (2d) 815.

December 19, 1958—No. 37,478.

*Blacker & Blacker,* for relator.

*Miles Lord,* Attorney General, and *George C. Gubbins, Jr.,* Assistant
Attorney General, for respondent commissioner.

MATSON, JUSTICE.

Certiorari to review a decision of the commissioner of employment
security holding that claimant was not disqualified from benefits under
the Employment Security Act and that any benefits paid should be
charged to employer's experience-rating account.

The question before us is whether an employee, a nonmember of the
union local who resigned from his job in obedience to instructions from
the union business representative because of union seniority regula-
tions, is entitled to unemployment benefits when the employer, by a

collective-bargaining contract, had agreed that changes of employees should be made according to union seniority rules.

Relator, Fisher Amusement Corporation, is an employer subject to the provisions of the Employment Security Act. It owns and operates three motion picture theatres in Minneapolis, among them being the Campus Theatre. The wages, hours, and other conditions of employment of moving picture machine operators at employer's theatre are governed by a collective-bargaining agreement with Moving Picture Machine Operators Union, Local 219, of Minneapolis, which is affiliated with International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada. Under this agreement, the employer agrees to employ only those operators affiliated, directly or by permit, with Local 219, and the local agrees to furnish competent employees. The contract provision relating to seniority reads as follows:

"All changes of operators shall be made in strict compliance with the laws of Local 219 pertaining to seniority."

Because of this seniority provision, employer has no control over the selection of projectionists sent him. If the employer decides that he does not want the projectionist who is sent him, he reports that fact to the union and his objection is conclusively ruled upon by a board of union men.[1]

The seniority system of Local 219 divides its members into two groups, the lowest 20 in seniority being called the "junior group." If a member not in the junior group is out of work through no fault of his own, he has the right to "bump" a junior group member and assume the latter's job. Members not in the junior group are not subject to being bumped. If a projectionist job becomes available, it is filled on the basis of seniority. If, however, no member of the local is available or none desires the job, nonmembers of the local occasionally are sent to fill the job. The nonmembers of the local have no seniority status in the union and are subject at all times to being bumped by any member of

---

[1]In cases of proven drunkenness, dishonesty, or incompetency however, the employer may, pursuant to the contract, dismiss the employee without resorting to the above procedure.

Local 219. Furthermore, whether or not they are sent to jobs and in which order is entirely discretionary with the business representative of the local. They have the same rights on the job, however, *with the exception of seniority,* as do members of the local.

Claimant, Murray Anson, was a nonmember of Local 219. He was a member of International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada and a member of New York Local 306, a sister local of 219. He had resided in Minneapolis for 3½ years preceding his claim. Because of his status as a member of a sister local of Local 219, he had been sent, over this period of residency, to various theatres as a projectionist by the business representative of Local 219. He began employment at the Campus Theatre on April 10, 1956, upon being sent there by the local's business representative, Frank Schilken, Jr. This position was available since no member of Local 219 indicated a desire for the job. In accepting the employment, claimant knew that he had no seniority rights and that he was subject to being replaced at any time a member wanted his job. He remained at the Campus Theatre for about 6 months or until October 8, 1956, when Schilken ordered him to resign to make room for a member. In compliance with Schilken's instructions, claimant terminated his services without protest by giving employer 2 weeks' written notice of his resignation. There is no evidence that claimant's termination of work was not in accord with union seniority regulations. The new operator assigned to take claimant's place was accepted without objection by employer.

On December 3, 1956, claimant registered for work at the state employment office and filed a claim for benefits. The claims deputy determined that claimant was involuntarily separated from his employment for reasons not construable as misconduct; that he was not disqualified; and that benefits paid to him, if any, should be charged to employer's experience-rating account. This determination subsequently was affirmed by the decision of the Appeals Tribunal, and its decision in turn was adopted by the commissioner of employment security. The case comes before this court for review on a writ of certiorari.

Up to the time of the issuance of the decision of the Appeals Tribunal, no benefits had actually been paid claimant and employer's

experience-rating account had not been charged. Claimant was paid $33 for the week ending December 23, 1956, which he later returned with the statement that he did not feel that he was available for work during such week.

Employer contends that claimant is disqualified from receiving unemployment benefits for two reasons; namely, (1) because he was not "available for work," as required by M. S. A. 268.08, subd. 1(3), and (2) because he voluntarily terminated his employment without good cause attributable to the employer within the meaning of § 268.09, subd. 1(1), which reads:

"An individual shall be disqualified for benefits:

"(1) If such individual voluntarily and without good cause attributable to the employer discontinued his employment with such employer * * *."

We find it necessary to consider only the second issue.

It is clear from a reading of the statute that, even if the employee voluntarily terminates his employment, he will not be disqualified for compensation unless it is further found that the termination was without good cause attributable to the employer. The commissioner alleges that no voluntary separation existed since claimant was ordered to leave his job by the business representative of Local 219. He further argues that the unemployment was attributable to the employer because of the latter's agreement, as a party to the collective-bargaining contract, that changes of operator were to be made pursuant to union seniority laws. Neither of the contentions of the commissioner can be sustained under the controlling statutory provisions and under our prior decisions.

Normally, either the employee has voluntarily terminated his employment, in which case no compensation is paid, or the employer has without good cause deprived the employee of his employment, in which case compensation is paid. In each of these cases, "fault" may be attached to one party or the other, and the granting or denying of compensation is in keeping with impartial justice. That "fault" is relevant in interpreting the Employment Security Act is evidenced by the italicized portions of the general statement of policy embodied in § 268.03, which reads as follows:

*"As a guide to the interpretation* and application of sections 268.03 to 268.24, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burdens. This can be provided by *encouraging employers to provide more stable employment* and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state will be promoted by providing, under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons *unemployed through no fault of their own."* (Italics supplied.)

It is clear from the foregoing declaration of policy that the legislature regarded "fault" as a basic element to be considered in interpreting and applying the act.[2] The term "fault," as applied to either the employer or the employee, is used in a broad juridical sense and does not necessarily imply a negligent or wrongful act.[3] For example, in one sense the employer should be encouraged to provide more stable employment, and fault attaches to the employer if he does not do so. If the employer fails in this respect, those becoming unemployed are entitled to unemployment compensation. In another sense, however, the quoted

---

[2]Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223.

[3]In Fannon v. Federal Cartridge Corp. 219 Minn. 306, 312, 18 N. W. (2d) 249, 252, 158 A. L. R. 389, 395, for example, we said:

"* * * Rather, we feel the legislature intended that, where factors or circumstances directly connected with employment result in illness or disease to an employe and make it impossible for him to continue therein because of serious danger to his health, termination of employment for this reason may correctly be said to be involuntary and for 'good cause attributable to the employer,' even though the employer be free from all negligence or wrongdoing in connection therewith."

portion shows that the legislature is not concerned with those whose unemployment is their own fault.

In the case at bar, "fault" in the sense of *cause* of unemployment cannot be attributed directly to an act of either the employer or the employee. In the literal sense of the term, the employee did not quit his job voluntarily since he was ordered to do so by the union's business representative. Nor can it be said that his unemployment was the fault of the employer, especially in the light of the employer's undisputed testimony that he did not want claimant to leave his employ. So, at least in this case, it would appear that granting compensation would not serve the express policy of encouraging more stable employment since the employer is not guilty of a violation of that principle. Rather, the fault, again in the sense of "cause," in this case lies with the overt act of the union, a third party. The legislature has not dealt expressly with fault or cause which has its immediate origin with the overt act of a third party. Despite an absence of reference to third-party acts as a cause, it would indeed be absurd to attribute to the legislature an intent that an act which is voluntary when performed directly by an employee shall be construed as involuntary when performed indirectly through a third party acting as the employee's agent.

Whether the separation from the employment is the voluntary or involuntary act of the employee is determined not by the immediate cause or motive for the act but by whether the employee *directly or indirectly* exercised a free-will choice and control as to the performance or nonperformance of the act. If the act of employment separation was performed by him directly of his own free will, or indirectly by his act of vesting in another discretionary authority to act in his behalf, the ultimate resulting act is a voluntary one which disqualifies him for compensation. This is likewise true when an employee acts directly in obedience to a representative control which, by his own choice, he has vested in another as his agent.

No authority need be cited for the statement that a labor union does not contract as an agent of the employer. It is equally clear that a union is the agent of its members.[4] In the recent case of Bergseth v. Zins-

---

[4]Mueller v. Chicago & N. W. Ry. Co. 194 Minn. 83, 259 N. W. 798.

master Baking Co. 252 Minn. 63, 89 N. W. (2d) 172, the union had negotiated a contract with the employer providing for a monthly pension upon 15 years of service and severance pay for termination of service after 10 to 15 years. Later, the union membership voted that retirement should become mandatory at age 65. Claimants were both 67 years of age and had served a period of 14 years, 1 year short of the 15 required for the monthly pension. Because of the action of their union, they were forced to terminate their employment. The ruling of the commissioner granting unemployment compensation was reversed by this court on the ground that the separations were voluntary and not attributable to the employer. In so doing, we said (252 Minn. 66, 89 N. W. [2d] 174):

"* * * Our statutes provide that when the majority of the employees in an appropriate collective-bargaining unit select a union to represent them that union is the exclusive bargaining agent *for all of the employees* in the unit with respect to wages, hours, and other conditions of employment. The right of the individual worker to deal with his employer regarding these matters is surrendered to the bargaining agent. 'Thus a worker is bound by the agreement made on his behalf by the bargaining agent to the same extent as though he had entered into it individually,' and the contract is a bar to negotiations with anyone else except a successor union." (Italics supplied.)

Summing up the decision, we further pointed out (252 Minn. 68, 89 N. W. [2d] 175):

"* * * These separations were without good cause attributable to the employer because they resulted from circumstances about which the employer could do nothing and which were solely within the control of the employee. *The separations were voluntary because they resulted from the acts of duly selected bargaining agents. 'Their acts were his [the employee's] acts.'* " (Italics supplied.)

Two other decisions are in accord. In Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 47 N. W. (2d) 449, where the collective-bargaining contract authorized a company vacation shutdown, claimant, who was not entitled to a vacation, was denied unemployment benefits on the ground that existence of the contract rendered his

unemployment voluntary. In Johnson v. LaGrange Shoe Corp. 244 Minn. 354, 70 N. W. (2d) 335, where the contract did not expressly authorize a vacation shutdown, it was held that, since the contract provided the right to vacations during a specified period and since the few who were not entitled to vacations were not a sufficient number for plant operation, their unemployment during that period was voluntary. Benefits were accordingly denied. In each of these cases the voluntary action of the union was held to be the voluntary action of the employee.

Nor does the evidence sustain the conclusion that the unemployment was attributable to the employer by virtue of his agreement to be bound by union seniority rules. This result is unavoidable even in light of the commissioner's finding that the employer knew or should have known that claimant could be replaced at any time a member sought the job. The employer had no right to refuse employment on these grounds— and any complaint registered would be ruled upon by a committee composed solely of union men. A collective-bargaining agreement is normally the product of give-and-take compromises between two parties, the union acting for the employees on the one hand and the employer on the other hand acting solely for himself. It cannot be said that the employer, in agreeing to observe union seniority rules, thereby constituted the union his agent. In no sense is the union answerable as the employer's agent.

Assuming for the purposes of discussion that claimant, a member of International and a member of a sister local of Local 219, is classified as any nonmember of the union, *the crucial question becomes whether or not the union action here binds a nonmember of the union.* In Division of Labor Law Enforcement v. Standard Coil Products Co. Inc. 136 Cal. App. (2d) Supp. 919, 921, 288 P. (2d) 637, 639, the court said:

"\* \* \* It [the collective-bargaining contract] is in the nature of a general offer, and an individual who accepts employment or continues his employment, after it becomes effective, does so on the terms and conditions thereby fixed. \* \* \* When the agreement purports to cover all employees, nonunion members who adopt it are fully bound and protected by it."[5]

---

[5]See, also, Yazoo & M. V. R. Co. v. Webb (5 Cir.) 64 F. (2d) 902; Gregg

It is not to be overlooked that the contract here, containing a "union shop" clause, necessarily purported to cover all employees.

Similarly, in Bridges v. F. H. McGraw & Co. (Ky.) 302 S. W. (2d) 109, 112, the court said:

"* * * When one accepts employment under the collective agreement, he thereby ratifies and accepts its terms, and his rights and his employer's rights are to be measured and adjudged by that contract."[6]

Finally, in Johnson v. LaGrange Shoe Corp. *supra,* in which *four of the claimants were nonmembers of the union,* we said regarding rights to unemployment compensation (244 Minn. 361, 70 N. W. [2d] 340):

"* * * Where he has agreed, through the medium of his bargaining agent, directly or by implication, that the plant may close down during a vacation period, we think that under our rule of construction it should be held that he is voluntarily unemployed * * *."

The Johnson case drew no distinction between members and nonmembers.

We conclude, therefore, that, when a nonmember of a union local knowingly accepts—or continues—employment with an employer who is subject to the seniority provisions of a collective-bargaining agreement with the union local, he thereby ratifies and accepts the terms of the contract, and, subject to those terms, he constitutes the union his bargaining agent, and its acts are his acts; and when, upon request of the local's business agent, he resigns his employment so that a member of the local may claim his job, his act of resignation is voluntary and without good cause attributable to the employer under § 268.09, subd. 1(1).

It is clear from these principles that if the claimant adopted the collective-bargaining contract, which included the seniority provision,

---

v. Starks, 188 Ky. 834, 224 S. W. 459.

[6]See, also, Annotation, 18 A. L. R. (2d) 370:

"It has been generally held that a collective labor agreement made between an employer and a labor union for the benefit of all the employees, or a class of employees, may be enforced by an individual employee within the scope of the agreement, even though he is not a member of the contracting union."

he is to be bound by its terms—and the evidence is not conflicting that claimant's actions represented an adoption of the agreement: (1) He was a member of International and a member of a sister local of Local 219; (2) he was sent to all his jobs by the union over his 3½ years' residency in Minneapolis; (3) he received the same rights accorded members with the one exception of seniority; and (4) he knew that he would be required to leave his job when a member sought it and he did so without objection. Moreover, the contract bound employer to employ only those affiliated with Local 219, directly or by permit, and the union agreed to furnish all operators.

For the foregoing reasons, we hold that the evidence does not support the commissioner's determination that claimant became unemployed involuntarily and with good cause attributable to the employer.

The decision of the commissioner is reversed.

Reversed.