William J. STAWIKOWSKI, Relator,

v.

COLLINS ELECTRIC CONSTRUCTION CO., Respondent,

Commissioner of Department of Economic Security, Respondent.

Floyd TURLEY, Relator,

v.

MUSKA ELECTRIC CO., Respondent,

Commissioner of Department of Economic Security, Respondent.

Dennis C. MOORE, Relator,

v.

PEOPLES ELECTRIC CO., INC., Respondent,

Commissioner of Department of Economic Security, Respondent.

No. 48579–48581.

Supreme Court of Minnesota.

July 27, 1979.

Robins, Davis & Lyons and Bruce A. Finzen, St. Paul, for relators Stawikowski, Turley and Moore.

Felhaber, Larson, Fenlon & Vogt and James M. Dawson and Stephen J. Burton, St. Paul, for respondent Collins Electric, Muska Electric Co., and Peoples Electric Co., Inc.

Warren Spannaus, Atty. Gen., Peter C. Andrews, Asst. Atty. Gen., Frank W. Levin, Sp. Asst. Atty. Gen., for Commr. of Dept. of Economic Security.

Heard before ROGOSHESKE, TODD, and STONE, JJ., and reconsidered and decided by the court en banc.

## OPINION

ROGOSHESKE, Justice.

This consolidated appeal by claimants, three journeyman electricians, challenges denial of unemployment compensation by the commissioner of the Minnesota Department of Economic Security upon determination that each, under Minn.St.1976, § 268.09, subd. 1, as interpreted by *Anson v. Fisher Amusement Corp.*, 254 Minn. 93, 93 N.W.2d 815 (1958), "voluntarily and without good

cause attributable to the employer discontinued his employment." Claimants acknowledge that the *Anson* case is controlling and requires affirmance but urge, joined by the Department of Economic Security, that this court reconsider the interpretation of that statutory provision and overrule the so-called implied or constructive voluntary termination rule adopted and applied in *Anson* and three earlier cases.[1] For reasons that follow we decline to do so, commending to the legislature consideration of any statutory changes in the definition of voluntary discontinuance of employment and the economic consequences to employers.

The basic facts involving each claimant are the same and are undisputed. Each claimant filed a claim for unemployment benefits following separation from his employment as an apprentice electrician upon successful completion of his apprenticeship training program. Separation from employment was ordered by the St. Paul Area Electrical Joint Apprenticeship and Training Committee (apprenticeship committee), pursuant to the provisions of Joint Apprenticeship Training Standards. The standards were promulgated and adopted by the apprenticeship committee, which was established under a collective bargaining agreement between the International Brotherhood of Electrical Workers, Local Union No. 110 (union), and the St. Paul Chapter of the National Electrical Contractors' Association (NECA).[2] The apprenticeship committee is composed of three members of each organization.[3]

---

1. *Bergseth v. Zinsmaster Baking Co.*, 252 Minn. 63, 89 N.W.2d 172 (1958); *Johnson v. LaGrange Shoe Corporation*, 244 Minn. 354, 70 N.W.2d 335 (1955); *Jackson v. Minneapolis-Honeywell Regulator Co.*, 234 Minn. 52, 47 N.W.2d 449 (1951).

2. The union is the exclusive bargaining representative of each claimant, and NECA is the collective bargaining representative of each employer. Claimants and their employers are bound by the terms of the agreement negotiated by their respective representatives.

3. The apprenticeship committee selects individuals who have graduated from high school and a technical vocational school approved by the

committee. Once selected, the individual must sign a formal agreement binding him to the terms and conditions of the apprenticeship standards and the collective bargaining agreement negotiated by NECA and the union. The apprenticeship program, usually 4 years in duration, consists of formal classes and on-the-job training approved, controlled, and closely monitored by the apprenticeship committee, which also has authority to transfer apprentices from one job or employer to another. The committee also determines whether an employer is qualified to have an apprentice and, subject to the current labor agreement, the number of apprentices that may be indentured to the employer's journeyman electricians.

After completion of the apprenticeship program and termination of employment as apprentices by orders of the apprenticeship committee, claimants were required to register with the seniority board established under the seniority system addendum to the collective bargaining agreement between the union and NECA for referral to work as journeyman electricians. At the time of each claimant's termination, there was substantial unemployment of journeyman electricians in the electrical contracting industry due to prevailing economic conditions. Therefore claimants, who were placed at the bottom of the seniority list, could not find employment as journeyman electricians immediately upon completion of their apprenticeship training and consequently filed the present claims for unemployment benefits. Apparently at the time claimants were terminated, apprentice work was still available from each former employer, but the employers were precluded from continuing to employ claimants as apprentices by the terms of the seniority addendum to the collective bargaining agreement.

Claimants contend that they should not be disqualified from receiving unemployment benefits on the ground that their termination was voluntary when such termination occurred by operation of a collectively bargained seniority system. The statute applicable at the time the claims were filed, Minn.St.1976, § 268.09, subd. 1, stated:

"An individual shall be disqualified for benefits:

"(1) * * * If such individual voluntarily and without good cause attributable to the employer discontinued his employment with such employer * * *."

In *Anson v. Fisher Amusement Corp.*, 254 Minn. 93, 93 N.W.2d 815, the factual context of which cannot be distinguished from the present case, we construed the statutory provision to be contrary to claimants' position. Claimants acknowledge, as they must, that *Anson* is controlling but urge us to overrule that holding.

The claimant in *Anson* was a movie projectionist, not a member of the local

Minneapolis union but a member of a sister local in New York City. The collective bargaining agreement between the employer and the local union incorporated union seniority laws which provided that jobs were to be filled on the basis of seniority. Nonmembers of the local were occasionally sent to fill jobs when local members were unavailable or when local members did not want the jobs. Nonmembers did not have seniority status, however, and were subject at all times to being bumped by members of the local union. Anson, who fully understood the workings of the system, accepted a projectionist job in Minnesota as a nonmember and was subsequently bumped by a member of the local union. After resigning at the union's request, he filed a claim for unemployment benefits. In reversing the commissioner's decision to grant benefits, we stated:

"Whether the separation from the employment is the voluntary or involuntary act of the employee is determined not by the immediate cause or motive for the act but by whether the employee *directly or indirectly* exercised a free-will choice and control as to the performance or nonperformance of the act. If the act of employment separation was performed by him directly of his own free will, or indirectly by his act of vesting in another discretionary authority to act in his behalf, the ultimate resulting act is a voluntary one which disqualifies him for compensation. This is likewise true when an employee acts directly in obedience to a representative control which, by his own choice, he has vested in another as his agent." 254 Minn. 98, 93 N.W.2d 819.

In the present case, claimants, upon acceptance into the apprenticeship program, signed formal apprenticeship agreements binding them to the terms and conditions of Joint Apprenticeship Training Standards and the collective bargaining agreement between the union and NECA. Once they completed their apprenticeship programs, they attained the status of journeyman electricians, were terminated from their

employment, and became subject to the seniority system as provided in the addendum to the collective bargaining agreement. There is no question that the bargained for procedures were not properly followed. As in *Anson,* claimants knowingly accepted employment from employers subject to the seniority provisions of a collective bargaining agreement. While we held in *Anson* that acceptance of employment under such conditions constitutes a ratification of the contract by the employee and designation of the union as his bargaining agent, we need not apply a ratification-by-conduct principle here, since claimants expressly and formally agreed to abide by the contract and to be represented by the union when they accepted their apprenticeships.[4]

Claimants' terminations by orders of the apprenticeship committee do not differ significantly from Anson's resignation at the union's request. In both instances, the collective bargaining agreements established seniority systems that required certain employees—new journeyman electricians and nonmembers of the local union—to give up their jobs to persons with greater seniority. Since claimants, like Anson, agreed to the seniority system through their bargaining agent, their unemployment is voluntary under our construction of the statute in the *Anson* case.

In *Anson,* we emphasized that "fault" is a basic element to be considered in interpreting unemployment compensation statutes. Minn.St. 268.03, the general declaration of policy, states that unemployment reserves are to be used for the benefit of "persons unemployed through no fault of their own." It also stresses that the compulsory setting aside of funds is designed to "encourag[e] employers to provide more stable employment." The concept of employee fault is expressed in Minn.St.1976, § 268.09, subd. 1, which disqualifies from benefits employees who discontinue their employment "voluntarily and without good cause attributable to the employer." Under the statutory pro-

vision governing the present case, such disqualification is partial, lasting generally for about 5 weeks. If no suitable work is found, the employee becomes eligible for benefits. If the employee is entirely free from fault, eligible for benefits, and benefits are paid pursuant to a valid claim, fault is, in a sense, the employer's for failing to provide stable employment. The benefits paid to an employee are charged against the employer's account, and an experience ratio is computed. Minn.St.1976, § 268.06, subds. 5 and 6. The employer's rate of contribution to the unemployment compensation fund is arrived at by adding the minimum rate to the experience ratio. Minn.St.1976, § 268.06, subd. 8. Thus, those employers who terminate employees without good cause when the employees are yet willing to continue their employment are compelled to assume financial responsibility for involuntary unemployment. In cases of partial disqualification, however, benefits are not chargeable to the employer's account. Minn.St.1976, § 268.09, subd. 1(3).

In the present case, "fault" cannot be attributed directly to acts of either claimants or their employers—the claimants were terminated by orders of the apprenticeship committee even though they desired to continue working; the employers had apprentice work available but were bound by the terms of the collective bargaining agreement to terminate employees who had attained journeyman status. Grants of benefits on these facts would not encourage stable employment but would impose unfair burdens by virtue of their effect upon the employers' experience ratios and contribution rates. Claimants insist that denials of benefits similarly frustrate the statutory purpose because, at the time of their separation, they wished to remain at their jobs—none left of his own accord or agreed in advance to waive unemployment benefits, which is forbidden by Minn.St. 268.17, subd. 1.[5] Since "fault" for the ter-

---

4. See, footnote 3, *supra.*

5. Minn.St. 268.17, subd. 1, provides that any agreement to waive, release, or commute an

individual's rights to benefits shall be void and precludes an employer from accepting or requiring such a waiver. *In Bergseth v. Zinsmaster Baking Co.,* 252 Minn. 63, 89 N.W.2d 172,

minations in the sense of cause lies with both the union (claimants' agent) and the employers, claimants argue that the collective bargaining agreement should be disregarded and that the purposes of the statute would be better fulfilled by our adoption of the test for voluntariness enunciated in *Campbell Soup Co. v. Board of Review,* 13 N.J. 431, 100 A.2d 287 (1953). Under that construction, disqualification would be "limited to separations where the decision whether to go or stay lay at the time with the worker alone and, even then, to bar him only if he left his work without good cause." 13 N.J. 435, 100 A.2d 289.

The Minnesota Department of Economic Security, seeking to uphold awards of unemployment benefits against employers' claims of constructive voluntary termination. In addition, the department argues that the rule is unsound (especially in light of a 1977 amendment abolishing partial disqualification and making disqualification permanent for the duration of the unemployment) and that it is difficult to apply. L.1977, c. 4, § 8. It further argues that the cases which developed the rule have been nullified by the legislature and questioned by this court[6] and that this court, as creator of the rule, can most effectively abolish it. The department urges that our prior decisions be reversed, that the constructive voluntary termination rule be repudiated, and that the test for voluntariness enunciated in the *Campbell Soup* case be adopted. We fully agree that the underlying purpose and objective of our unemployment compensation statute would be better served by applying the test advocated by claimants and the department, provided a method to relieve employers of the unwarranted financial consequences without imperiling the unemployment reserve funds were available. Although such a test would surely be easier to administer, for reasons that follow we believe such changes must be instituted by the legislature.

We have construed the statutory voluntary termination provision in several cases. In *Jackson v. Minneapolis-Honeywell Regulator Co.,* 234 Minn. 52, 47 N.W.2d 449 (1951), we held that employees not entitled to vacation pay were voluntarily unemployed and not eligible for unemployment compensation during a vacation shutdown of the plant occurring by reason of a clause in the collective bargaining agreement. We reached the same conclusion in *Johnson v. LaGrange Shoe Corporation,* 244 Minn. 354, 70 N.W.2d 335 (1955), where the union had acquiesced in a vacation shutdown although the contract between the employer and employees did not expressly provide for it. A somewhat different issue was presented in *Bergseth v. Zinsmaster Baking Co.,* 252 Minn. 63, 89 N.W.2d 172 (1958). In that case, we held that termination of an employee at age 65 pursuant to a collectively bargained mandatory retirement plan was voluntary unemployment. Shortly after *Bergseth* we decided the *Anson* case. Most recently, we commented on the constructive voluntary termination doctrine in *Hanson v. I.D.S. Properties Management Co.,* 308 Minn. 422, 242 N.W.2d 833 (1976). Although we declined to overrule our earlier decisions and decided that case on other grounds, we indicated that our holding should be re-examined in an appropriate context.

---

we concluded that an agreement for the voluntary termination of employment was not prohibited by this section. Since the employee never became entitled to benefits, he did not waive any right to them.

**6.** In *Hanson v. I.D.S. Properties Management Co.,* 308 Minn. 422, 425, 242 N.W.2d 833, 835 (1976), we stated: "Counsel for the employee illustrated well at oral argument a principal problem with Anson. The statutory scheme underlying unemployment compensation tends to force an individual to sign a union contract to take an available job, then denies him benefits when he is 'bumped' on the theory that he

voluntarily consented to termination. There may be similar difficulties with the presumption of voluntariness in *Bergseth * * *.*

"* * * While there may be reasons for questioning these decisions, we decline to distinguish or overrule them in the context of the instant case. * * * Reaching this issue would plunge us unnecessarily into a premature resolution of potentially difficult legal questions. If this issue is as important to the commissioner as counsel suggests, we are confident that another case will present it in a more appropriate posture for our decision."

Since its enactment in 1936, the unemployment compensation statute has provided for some period of disqualification for employees who "voluntarily" terminated their employment. Ex.Sess.L.1936, c. 2, § 7. The pertinent language of Minn.St. 268.09 has remained identical since 1945, although the section has been amended no less than eight times subsequent to our decisions in *Jackson* (1951) and *Bergseth* and *Anson* (1958). In 1975, the legislature overruled our specific decisions in *Jackson* and *Johnson* by amending § 268.04, subd. 23, the section defining "unemployment," to provide: "Any individual unemployed as a result of a uniform vacation shutdown shall not be deemed to be voluntarily unemployed." L.1975, c. 336, § 3. Our decision in *Bergseth* was similarly overruled in 1977 by an amendment to § 268.09, subd. 1(2), stating that disqualification does not result from mandatory retirement at age 65 or older. L.1977, c. 242, § 1. The remaining portions of § 268.09 were retained unchanged after each amendment, and no effort has been made to alter the wording of the test for disqualification set out in subd. 1. The department argues that the legislature's omission to undertake revision of the constructive voluntary termination rule results from the difficulties presented by drafting a suitably broad amendment. We are not persuaded that the problem is a real one, since the legislature could simply amend § 268.09, subd. 1, to define "voluntary" in the language of the *Campbell Soup* case.

 The primary object in interpreting a statute is to ascertain and effectuate the intention of the legislature. To aid courts in determining legislative intent, the legislature, by § 645.17, has established certain presumptions which include: "When a court of last resort has construed the language of a law, the legislature in subsequent laws on the same subject matter intends the same construction to be placed upon such language." We have frequently held that the re-enactment of a statute without change, after construction of the statute by this court, presumptively constitutes an adoption of such construction. *Western Union Telegraph Co. v. Spaeth,* 232 Minn. 128, 44 N.W.2d 440 (1950); *Cashman v. Hedberg,* 215 Minn. 463, 10 N.W.2d 388 (1943); 1A Sands, Sutherland Statutory Construction (4 ed.) § 22.33. Since our decision in *Anson* in 1958, the legislature has re-enacted the language construed in that case without change, while altering other portions of the statute. To ascribe to a modern-day legislature, staffed as it is with research assistants and aided by the testimony of organized employer and employee groups affected by the issues presented, an unawareness of our adoption of the constructive voluntary termination construction of § 268.09, subd. 1, is not only unrealistic but borders on the absurd. In short, the legislature doubtless has been aware of our interpretation and has not been persuaded to enact the *Campbell Soup* case test despite the department's efforts to effect a revision. We must presume, therefore, that the legislature adopted our construction of the statute that termination by reason of the seniority provision of a collective bargaining agreement is voluntary.

 Although we believe that the equities favor nondisqualification of claimants in cases such as this, we do well to exercise judicial restraint in deference to the legislature's superior ability to deal with broad social and economic policy issues of this nature. Resolution of such issues requires determination of facts and policy which, to be sound, must be based on data and experience not available to us but easily secured by the legislature through its hearing process. When a longstanding judicial decision deeply rooted in social and economic considerations is not clearly wrong, we believe our proper role is to outline the problem, articulate the judicial view, and refer the matter to the legislature. We therefore exhort the legislature to consider statutory changes in the definition of voluntary discontinuance of employment and provisions governing employer contributions, confident that its resolution will serve the best interests of the public.

Affirmed.

SCOTT, J., took no part in the consideration or decision of this case.