CHURCHILL DOWNS, INC., Appellant,

v.

KENTUCKY UNEMPLOYMENT INSUR-
ANCE COMMISSION et al., Appellees.

Court of Appeals of Kentucky.

May 1, 1970.

Rehearing Denied June 26, 1970.

Kent L. McElwain, McElwain, Dinning, Clarke & Winstead, Louisville, for appellant.

Paul E. Tierney, James G. Childers, Frankfort, Herbert Segal, Louisville, for appellees.

CULLEN, Commissioner.

This appeal presents the question of whether certain licensed pari-mutuel employees of appellant Churchill Downs become involuntarily unemployed at the conclusion of each of the two annual race meetings conducted by appellant, so as to qualify for unemployment compensation payable from appellant's reserve account. The trial court adjudged that the employees are entitled to receive unemployment compensation payments from appellant's reserve account. Appellant contends

that the employees do not become unemployed in the circumstances, but even if they do, appellant's reserve account is not chargeable.

The parties cite and rely upon a number of decisions from this and other jurisdictions. The chief authorities urged in behalf of appellant are Kentucky Unemployment Insurance Commission v. Kroehler Mfg. Co., Ky., 352 S.W.2d 212, and Kentucky Unemployment Insurance Commission v. Reynolds Metals Company, Ky., 360 S.W.2d 746. The principal decision from this jurisdiction relied upon by appellees, and considered dispositive by the trial court, is Kentucky Unemployment Insurance Commission v. American National Bank & Trust Company, Ky., 367 S.W.2d 260.

KRS Chapter 341 embodies the statutory basis for unemployment compensation. KRS 341.370 is of particular significance in this decision and in pertinent part provides:

"(2) A worker shall be disqualified from receiving benefits or serving a waiting period for the duration of any period of unemployment with respect to which:"

\*  \*  \*  \*  \*  \*

"(c) He has left his most recent suitable work voluntarily without good cause."

KRS 341.530(3) relieves an employer's reserve account in certain enumerated circumstances including the circumstance that the employee "\*  \*  \* voluntarily left his most recent work with such employer without good cause attributable to the employment, \*  \*  \*."

It will be observed that the disqualification prescribed by KRS 341.370, and the relief of the employer's reserve account provided by KRS 341.530, both are conditioned upon a finding that the worker *voluntarily* left his most recent work. The controlling factor is the act of *volition* on the part of the *worker*. Any volition or lack of it on the part of the *employer* is not made relevant.

Our task here is to construe and apply the statute. The policy of the law in the field of economic security has been declared by the legislature and is not for us to question.

The statute really is plain and clear, and does not require construction. The worker is disqualified if he voluntarily left his work. The only question of application is whether the workers in the instant case did voluntarily leave their work.

■ The appellant's reliance upon Kentucky Unemployment Insurance Commission v. Kroehler Mfg. Co., Ky., 352 S.W.2d 212, and Kentucky Unemployment Insurance Commission v. Reynolds Metals Company, Ky., 360 S.W.2d 746, is as establishing an "agency theory" under which a worker whose union representatives have agreed to a contract under which the worker's employment is to be terminated upon the happening of certain events is deemed to have voluntarily agreed through his agents to leave his work when one of those events occurs. We do not question the validity of the proposition that a worker may make agreements through a union as his agent, but we think the significant consideration in any case is whether the agreement executed on his behalf involved any *freedom of choice* of the *worker* which the agent could have exercised for him. In Kroehler and in Reynolds Metals the union contracts provided for retirement at age 65. This provision of the contracts was initially a matter for *negotiation*; the union, on behalf of the workers, had a *choice* for the workers *not to retire* at age 65—not to leave the work. The union, in the bargaining process, *chose* to agree to the retirement clause, perhaps because the union felt favorable concessions on other points could be obtained from the employer, or even possibly because the union *wanted* the retirement clause.

■ In the instant case, if the union contract be considered as embracing the implication of agreement that the pari-mutuel workers would cease working when

the meets were over (which agreement the contract did not expressly set forth), it would not represent the exercise of any *choice* by or on behalf of the workers, because they never had any option to man the mari-mutuel machines at an empty track. Their ceasing to work at the close of each meet was not a matter for negotiation or bargaining—it was simply an inevitable feature of the nature of the work. The workers cannot be considered to have voluntarily agreed to leave the work, because there was nothing to be the subject of an agreement.

The significance of the element of the existence of a choice is illustrated by Kentucky Unemployment Insurance Commission v. Young, Ky., 389 S.W.2d 451. There the employer unilaterally adopted a policy that all workers must retire at age 65. There was no bargaining or exercise of any choice by the workers. This court held that a worker in that case whose employment was terminated when he reached 65 had not voluntarily left his work. The court said:

> "As we read the record in this case Young did not have a choice. We think the word 'voluntarily' must certainly be defined as meaning 'freely given' and 'proceeding from one's own choice or full consent.' "

So we think that any agreement that could be considered to have been made by the pari-mutuel workers in the instant case, whether or not made through their union as "agent," to leave work at the close of a meet, was in no sense the exercise of a choice of alternatives so as to be classifiable as a voluntary election to leave the work.

■ With the "agency theory" properly out of the way, it becomes apparent that the instant case involves the same principle that governed in Kentucky Unemployment Insurance Commission v. American National Bank & Trust Company, Ky., 367 S. W.2d 260. There the employer bank took temporary quarters during renovation of its permanent building and engaged the employe as a guard at the temporary location. It was contended by the bank that the employe had voluntarily quit when the renovation work was completed and the need for a guard at the temporary quarters ceased, because he had known from the outset that the work would so cease. We rejected that contention, saying in part (367 S.W.2d at p. 262):

> "Thus it is our opinion that a correct interpretation of the statute is that an employee who accepts a job which he knows in advance to be temporary does not voluntarily leave when the job ceases to exist."

The appellant in the instant case suggests that a different rule should apply here because the state law as administered by the State Racing Commission fixes the periods during which racing meets may be held at each track, and therefore the employer track has no choice to continue the work beyond the fixed closing date—the employer has no power under the law to continue the employment. We find no basis for this argument in the terms of the unemployment compensation statute. Where unemployment results from the discontinuance of operations by the employer, the *reason* for the discontinuance has no bearing at all on the right of the workman to draw benefits (except where discontinuance is due to a *strike*). It makes no difference whether the discontinuance is caused by a public law, as in the instant case, or is caused by the natural law of economics, as in the American Bank case, because the reason why the employer discontinued furnishing the work is irrelevant.

Actually, the most plain and simple reason why the workmen in the instant case cannot be considered to have left their most recent work is that the work *left them*; the work simply ceased to exist; the employer discontinued the furnishing of work to be done. To "leave" something contemplates that the thing is left behind; here no jobs were left behind.

A number of cases from foreign jurisdictions are relied upon by the appellant. They include Kilgore v. Industrial Commission of Missouri, Mo.App., 337 S.W.2d 91; Anson v. Fisher Amusement Corporation, 254 Minn. 93, 93 N.W.2d 815; Blakeslee v. Administrator, Unemployment Compensation Act, 25 Conn.Sup. 290, 203 A.2d 119; Dubinsky Bros. Inc. v. Industrial Commission of Missouri, Mo., 373 S.W. 2d 9; and Sarja v. Iron Range Resources and Rehabilitation, 274 Minn. 458, 144 N. W.2d 377. The first four of the cited cases involved movie projectionists whose unemployment resulted from provisions of union contracts which the *union had insisted upon*. The appellant cites these cases as authority for the proposition that where the *employer* has no choice as to the discontinuance of the employment (it being required by a union contract), the employe is not entitled to benefits. Actually, what the cases stand for is that where the discontinuance is by *choice of the employe*, made through his agent the union, he is deemed to have voluntarily left his employment. As hereinbefore pointed out, the employes in the case before us never had any choice.

The Sarja case, above cited, is one of discharge for *misconduct* and has no application here.

Cases have been cited involving professional athletes whose applications for compensation during the "off season" were denied. However, the athletes in those cases were on *annual* salaries and were under contractual obligations during the off season, so the substance of the holdings was that the athletes were not in fact unemployed. See Bell v. Corsi, 282 App.Div. 634, 126 N.Y.S.2d 115; Claim of Kaftan, 283 App.Div. 759, 128 N.Y.S.2d 175.

Our conclusion is that the circuit court correctly held that the appellee workmen had not voluntarily left their work. It follows that the court correctly held that the benefits were chargeable to the employer's reserve account, because under KRS 341.-530(3) the conditions of relief of the reserve account are (1) that the employe voluntarily left his most recent work with the employer *and* (2) the leaving was without good cause attributable to the employment. The first condition has not been met, so the relief clause does not become operable.

The judgment is affirmed.

HILL, C. J., and MILLIKEN, OSBORNE, PALMORE and REED, JJ., concur.

NEIKIRK and STEINFELD, JJ., dissent.

STEINFELD, Judge (dissenting).

The opinion says that an employee who voluntarily quits is disqualified from receiving benefits but it holds that the separation on "get away day" of the subject employees was not voluntary on their part. It attempts to distinguish the situation here from the announcements in Kentucky Unemployment Insurance Commission v. Kroehler Mfg. Co., Ky., 352 S.W.2d 212 (1961), and Kentucky Unemployment Insurance Commission v. Reynolds Metals Company, Ky., 360 S.W.2d 746 (1962). Those cases held the union to be the agent of the worker in arranging for him to voluntarily leave his employment upon reaching retirement age. Here the worker, by accepting employment for a specifically limited time, voluntarily made his own arrangements to leave that employment at the termination of the racing meet. I fail to discern a distinction. Furthermore, the workers were licensed by the Kentucky Racing Commission to work only on the days allotted for racing at Churchill Downs.

The Century Dictionary & Cyclopedia defines voluntary as "Proceeding from the will; done of or due to one's own accord or free choice, * * *". It also defines voluntarily as "In a voluntary manner, of one's own motion; without being moved,

influenced, or impelled by others; spontaneously; freely * * *". It is patently clear to me that the pari-mutuel workers, on their own volition and without influence or being impelled by others, voluntarily agreed, as above defined, upon their separation from the job. The act disqualifies such persons from benefits. As long as Kentucky follows the "agency" theory enunciated in Kroehler and Reynolds, supra, which rule is also followed by many other states, I must respectfully dissent.

NEIKIRK, J., joins in this dissent.