**The MURRAY OPERATION OF the TAPPAN COMPANY, Appellant,**

v.

**KENTUCKY UNEMPLOYMENT INSURANCE COMMISSION, Commonwealth of Kentucky, Martha H. Clapp, Jerry C. Ray, Frances M. Swift, Preston Orr, Clayton W. Adams, Jerilyn A. Colson, James A. Thomas, James M. Williams, Elizabeth M. Gargus, Jimmy D. Kimbro, Ada L. Richardson, Sandra M. Hughes, Elijah H. Balentine, John Flood, Terry E. Hopkins, and Charles D. Duncan, Appellees.**

Court of Appeals of Kentucky.

June 8, 1979.

John A. Gregory, Jr., Hughes, Gregory & Haverstock, Murray, for appellant.

August Winkenhofer, Jr., Dept. for Human Resources, Frankfort, for appellee, Kentucky Unemployment Ins. Commission.

Before WHITE, REYNOLDS and VANCE, JJ.

WHITE, Judge.

The Murray Operation of the Tappan Company (Tappan) appeals from an order of the Calloway Circuit Court affirming the right of certain Tappan employees to collect unemployment insurance benefits. Tappan contends that these employees are disqualified from obtaining such benefits because they were "voluntarily unemployed." The case is one of first impression in Kentucky, calling for the court's evaluation of several provisions of our unemployment insurance act.

The facts in this case are undisputed. All of the employees—appellees herein—are employed by Tappan and are members of Local 1068 of the United Auto Workers Union, with which Tappan has a collective bargaining agreement. This agreement was originally left out of the record but has since been added upon this court's motion. Under the terms of the agreement, Tappan was required to shut down production for one week to enable the employees to take vacations. There is evidence that this one-week shutdown was also used for certain management objectives, such as maintenance and repair. On May 20, 1977, Tappan posted notices informing its employees of the vacation shutdown from June 27 to July 5, 1977. In accordance with the agreement, Tappan posted sign-up sheets for those employees desiring to work during the shutdown. This notice, posted around June 17, stated that approximately 70 positions were available for the one-week shutdown.

Although all of the appellee-employees were aware of the list, none of them signed up to work. The reasons for such failure varied, although it does appear that more than 70 workers signed the list within a short time of its posting. Witnesses for Tappan did testify, however, that a later list was posted indicating the availability of more jobs during the shutdown.

None of the appellees were entitled to vacation pay. The record discloses that some of the appellees had only recently begun to work for Tappan, and thus were not eligible for vacation, while others, long-time employees of Tappan, had lost their vacation eligibility due to a 13-month strike which had ended several months before the shutdown period. This led the appellees to file for unemployment benefits for the one week of shutdown.

Tappan protested the claims filed against its account. The basis of this protest was that the employees were disqualified from unemployment insurance compensation due to KRS 341.370(1)(a) for failure to accept the work offered by the notices. After a hearing, however, the referee held that KRS 341.370(1)(a) was inapplicable because the bargaining agreement did not require the employees to accept substitute work in lieu of shutdown. On appeal, the Kentucky Unemployment Insurance Commission (Commission) affirmed the referee's decision and adopted its findings.

Tappan then appealed to the Calloway Circuit Court asserting that the agency decision incorrectly applied the law. It was Tappan's contention that the employees were disqualified not only under KRS 341.-370(1)(a), but also because their union membership made them voluntarily unemployed during the shutdown. KRS 341.370(2)(c). It was further asserted that the employees had failed to make a reasonable effort to obtain suitable work and were thus barred from collection of benefits under KRS 341.-350(4). After evaluation of these arguments, however, the circuit court affirmed the Commission's decision on the basis that the record disclosed adequate evidence to support eligibility.

On appeal to this court, Tappan argues that the decision below is clearly erroneous, not because the findings of fact were in error, but because the law was incorrectly applied to those facts. While that assertion does appear to be correct, *infra,* the initial problem is whether Tappan has waived certain theories of relief.

The transcript of the hearing before the referee indicates that Tappan's theory of the case was based upon KRS 341.370(1)(a) as it related to the posted notices. Further, all of the documents filed at the administrative level reflect that Tappan's ground of protest was that the appellees had refused an offer to work. The only indication of the other grounds now asserted by Tappan was the filing of the bargaining agreement. Upon such a record, it could be argued that Tappan has waived any arguments under KRS 341.350 and KRS 341.370(2). Cooper, *State Administrative Law,* Vol. 2 at 599 (1965). *See also, Kentucky Unemployment Insurance Commission v. General Electric Company,* Ky., 473 S.W.2d 808, 810 (1971).

■ The record does indicate, however, that the legal issues may have been narrowed by the referee, rather than by counsel for Tappan. In any event, the issues presented under KRS 341.370(2) and 341.350 were briefed before the trial court, and the Commission has responded to those issues herein. These additional factors indicate that Tappan has properly put all of its arguments into issue. *Cf., Kentucky Unemployment Insurance Commission v. General Electric Company, supra.* Thus, all of the issues raised by Tappan in its brief to this court will be discussed below.

■ Tappan contends that unemployment benefits should be denied because appellees were never unemployed. Tappan argues that the employment relationship continued to exist during the shutdown and appellees retained all benefits of employment; their status was merely that of employees on vacation without pay. Although we find appellant's argument persuasive, we feel constrained by the holding in *Kentucky Unemployment Insurance Commission v. General Electric Company, supra,* to find the shutdown period as it related to these appellees to be a period of unemployment. Based on KRS 341.080(3), which defines the term "week of employment," the Court in *General Electric, supra,* held that shutdowns result in unemployment where no vacation pay is awarded. However, the issue of whether such unemployment is voluntary and thus excluded from unemployment insurance coverage under KRS 341.370(2)(c) was left undecided.

KRS 341.370(2)(c) recites: "A worker shall be disqualified from receiving benefits for the duration of any period of unemployment with respect to which: (c) He has left his most recent suitable work voluntarily without good cause." The argument under this section is basically that since the shutdown was required by the bargaining agreement, the appellees voluntarily agreed to unemployment by virtue of their union membership.

This is a case of first impression in Kentucky. There appears to be a split of authority among those jurisdictions that have addressed the question. *Annot.,* 30 A.L.R.2d § 7. In those jurisdictions holding that unemployment compensation is unavailable for such employees, the judicial reasoning is summarized in *Mississippi State Employment Security Commission v. Jackson,* 237 Miss. 897, 116 So.2d 830, 832 (Miss.1960):

The shutdown for Christmas week was in accordance with the union contract and the union represented all the appellees. It cannot be said that appellees were unemployed within the meaning and purpose of the statute. They were not laid off; their employment had not been terminated, and the relationship of employer and employee continued during the week the plant was closed for the purposes stated. It is true that the proof showed appellees were willing to work during the vacation week if they could have obtained employment. But this does not mean that their absence from their regular employment during Christmas week was other than voluntary. Our view of the case is in accord with the weight of authority.

It appears that those courts examining this issue have turned the result upon specific language in the bargaining agreement. For example, the annotation, *supra,* lists four cases in which the court permitted employees in similar circumstances to collect benefits. In three of those cases, however, it appears that the holding was based upon agreements which provided that the shutdown was to be a vacation period for "employees of the department eligible for vacations."

The supplement to the annotation reveals that the split of authority has grown more pronounced in recent years. It also appears that in several jurisdictions the legislature has enacted statutes which abrogate judicial holdings denying benefits to employees. 30 A.L.R.2d § 9 (Supp.1970).

■ In Kentucky, there are two cases which should be evaluated even though they are not precisely on point. In *Kentucky Unemployment Insurance Commission v. Kroehler Manufacturing Company,* Ky., 352 S.W.2d 212 (1961), an employee was held not to be entitled to unemployment benefits where he had voluntarily agreed to retire at age 65. Closer to the instant case is *Kentucky Unemployment Insurance Commission v. Reynolds Metals Company,* Ky., 360 S.W.2d 746 (1962), where the same result was reached on the basis of

a collective bargaining agreement. In discussing the effect of such agreement the Court stated:

The only difference between the facts of *Kroehler* and those in the instant case concerns the method by which the involved pension plans were negotiated. In *Kroehler,* employees were permitted to participate in the retirement system by making written requests. In the instant case employees participated in the retirement plan pursuant to a collective bargaining agreement negotiated for them by their labor union and ratified by their vote. This difference is not significant because in both cases the employees voluntarily accepted plans which provided for a termination of their employment. Consequently, Driskell's retirement constituted a voluntary termination of his employment and he was not entitled to unemployment benefits. *Id.* at 747.

As the above discussion indicates, a logical standard in such cases would be to turn the result solely upon an interpretation of the controlling bargaining agreement, and this approach we accept. This rule merely entails an application of general contract law to determine whether the unemployment incurred was contemplated by the agreement. If so, the employees are disqualified from collecting benefits.

This standard for determining "voluntariness" is in harmony with the purposes of unemployment compensation legislation.

The purpose of the General Assembly in the enactment of such legislation was to provide benefits for only those employees who have been forced to leave their employment because of forces beyond their control and not because of any voluntary act of their own. *Kentucky Unemployment Insurance Commission v. Kroehler Manufacturing ·Company, supra,* 352 S.W.2d at 214.

■ Applying such a standard to this case leads to the conclusion that the appellee-employees are voluntarily unemployed and thus not entitled to benefits. This result is due to several provisions set out in the agreement. First, Article XII of the

agreement, which requires the company to shut down, recites:

Section 12.2. Vacation Period. Every effort shall be made to shut down the entire factory for vacation periods from June 1 through August 21 of each year and to make such shutdown periods the vacation period for employees who are not scheduled to work during the shut-down period. Such shutdown period may be for one (1), two (2) or three (3) weeks at the discretion of management, thereby permitting employees to take their vacations at the same time. However, there shall be a shutdown for vacation purposes for a minimum of one (1) week during the above vacation period.

Secondly, by listing eligibility requirements for vacation, the agreement recognizes that some employees will not be compensated during the shutdown. *See* Article XII, Section 12.1. This interpretation is bolstered by Article IX, Section 9.3, E.(1)(a), which recites:

E. Employment During Shut-down.

(1) During periods of shut-down such as vacation periods and Christmas holidays:

(a) Work list will be posted in each major department indicating in general the work to be done. Men signing these lists will indicate their preference of weeks and known shifts and any special skills. Men will be called in by seniority with due regard to special skills and qualifications, however, during vacation shut-down only, qualified employees who are not entitled to any vacation shall be given preference for the available work.

*Churchill Downs, Inc. v. Kentucky Unemployment Insurance Commission,* Ky., 454 S.W.2d 347 (1970), also indicates that the employees herein were voluntarily unemployed. In that case, the Court found that certain pari-mutuel employees were entitled to unemployment compensation when Churchill Downs closed for the season. The decision was based upon the Court's holding that, where the closing is not negotiable because it is mandated by law or the nature of the business, the unemployment is invol-

untary. Conversely, the Court noted that in *Kentucky Unemployment Insurance Commission v. Kroehler Manufacturing Company, supra,* and *Kentucky Unemployment Insurance Commission v. Reynolds Metals Company, supra,* the employees' union had a choice in agreeing to retirement ages. The test of voluntariness is whether the employee, or his agent, has elected between a choice of alternatives. *See also, McFadden v. Kentucky Unemployment Insurance Commission,* Ky.App., 25 Ky.L. Summ. 13 (September 22, 1978).

The second point for consideration is whether these appellees should be disqualified from benefits due to KRS 341.370(1)(a), which recites:

(1) According to the circumstances in each case, a worker shall be disqualified from receiving benefits:

(a) For not less than one (1) nor more than sixteen (16) weeks immediately following the commission of the disqualifying act, if, subsequent to his most recent work, he has failed without good cause either to apply for available, suitable work when so directed by the employment office or the secretary or to accept suitable work when offered him, or to return to his customary self-employment when so directed by the secretary.

This section is closely akin to KRS 341.-350(4), which requires the claimant to make a reasonable effort to obtain suitable work. The Commission has combined both of its arguments under this section, so for purposes of clarity Tappan's arguments will also be considered together.

Tappan's basic contention in this regard is that the posted notices constitute an offer of suitable work, and that by not responding to that notice, the appellees failed to make "such reasonable effort to obtain such work as might be expected of a prudent person under like circumstances." KRS 341.350(4).

"Suitable work" is defined under KRS 341.100. Applying that section to the instant case leads to the conclusion that

these workers are, in fact, disqualified from unemployment insurance benefits. Although it is true that the bargaining agreement placed no duty upon employees to apply for such work or to accept it if offered, it is the agreement itself which directs the posting of the list. That being the case, it cannot be said that an individual offer must be made to each employee. Further, since the agreement sets out the wages to be paid for such work, it cannot be said that the work offered was "unsuitable" merely because some employees may have been paid a lower hourly rate than their regular jobs. Finally, the Commission's argument that there were not enough jobs for all willing to work is without merit. By providing that the jobs be awarded first to employees ineligible for vacations, the agreement appears impliedly to recognize the situation where only a limited number of employees will be able to work during the shutdown period.

■ In addition to the existence of an offer of suitable work, the statutes require that the employee reject such work to be disqualified from receiving benefits. Such rejection under KRS 341.370(1)(a) is a failure to accept such work without good cause. In KRS 341.350(4), the rejection is by a failure to make reasonable efforts to obtain suitable work. There is evidence of both grounds in this case. For example, some of the employees stated that they declined to sign the list either because they didn't like the type of work offered or because they felt they needed a vacation. Neither reason would appear to be "good cause." In addition, such actions have been held to amount to a failure to obtain suitable work. *Kentucky Unemployment Insurance Commission v. Day*, Ky., 451 S.W.2d 656 (1970).

■ A slightly closer question is presented by the employees who stated they did not sign the lists because the lists were full when they saw them. However, even this reason amounts to a rejection under these facts. The agreement clearly spells out that notices would be posted and that first priority would be given to those employees ineligible for vacation pay. Further, there was some evidence that Tappan later increased the number of available positions but that the appellees failed to inquire as to that possibility.

While the facts found by the Commission are correct, it appears that the law has been incorrectly applied. *Southern Bell Telephone and Telegraph Company v. Kentucky Unemployment Insurance Commission*, Ky., 437 S.W.2d 775 (1969).

Therefore the judgment of the Calloway Circuit Court is reversed and remanded with instructions to direct the Commission to reverse its award and relieve the reserve account of appellant for any charges for benefits paid these employees.

All concur.