**James M. SEACRIST, Relator,**

v.

**CITY OF COTTAGE GROVE, Respondent,**

**Commissioner of Economic Security, Respondent.**

No. C3–83–1352.

Court of Appeals of Minnesota.

March 7, 1984.

Dale G. Swanson, Forest Lake, for relator.

Patricia A. O'Gorman, Cottage Grove, for respondent City of Cottage Grove.

Peter C. Andrews, Sp. Asst. Atty. Gen., St. Paul, for respondent Com'r of Econ. Sec.

Heard, considered and decided by FOLEY, P.J., and WOZNIAK and SEDGWICK, JJ.

## OPINION

WOZNIAK, Judge.

James M. Seacrist filed for unemployment benefits with the Department of Economic Security. A department claims deputy denied benefits because Seacrist voluntarily quit his job. The Appeals Tribunal also denied benefits but on grounds of an involuntary termination for misconduct. The Commissioner's representative affirmed, not on grounds of misconduct, however, but a voluntary termination. Seacrist appeals to this court.

We affirm.

## FACTS

Seacrist, a veteran, joined the Cottage Grove Police Department on January 1, 1973 as an officer. He was promoted to sergeant on May 16, 1978. In late 1982, he was an applicant for Police Chief of Bayport, Minnesota. As part of that application process, a background check was made on all applicants. On November 17, 1982, he submitted his written resignation from the force to his chief, and now claims he was forced to quit; the city claims he quit voluntarily.

Seacrist had been diagnosed as chemically dependent and underwent treatment in 1974. After staying dry for 19 months, he quit A.A. and began drinking again. He admits that on a normal afternoon, before going to work, he would drink eight whiskey and waters in a four-hour period. Nonetheless, he vehemently denies any alcohol problem and has refused help offered by the city. He does admit that drinking has affected his job performance.

On September 27, 1982, he was scheduled to attend a B.C.A. breathalyzer recertification class. Without the recertification, he could not make a valid DWI arrest or testify in court. He was 30 minutes late. Chief of Police Cusick warned him that tardiness would not be tolerated.

The next day, Seacrist was supposed to attend a department qualification shoot. To carry a gun, an officer must get a passing score in the shoot. He did not show up.

On October 2, 1982, he overslept and failed to report for duty. Chief Cusick had information that he was drunk. On October 10, 1982, he had the dispatcher give him a wake-up call. In spite of the wake-up, he was still late. The Chief warned him on October 22, 1982 not to use the dispatcher as an alarm clock and not to be late anymore. The Chief offered him help with his alcohol problems. He vehemently refused to admit he had a problem. The Chief gave him a two-day record suspension and placed him on six months probation.

Less than a month later, on November 16, 1982, he again used the dispatcher to wake him up. Again, however, he came in late. Instead of patrolling, he sat at the station watching TV. To cover up his tardiness, he asked the dispatcher to lie about the time he came in and to say that she did not give him a wake-up call. The Chief discovered the cover up.

After discovering the cover up, the Chief decided to take action against Seacrist. Upon arriving for duty on his night shift on November 17, 1982, Chief Cusick and the City Administrator, Carl Meissner, confronted him. The three of them discussed the possible effects of disciplinary action on his Bayport application. The Chief wanted to resolve the situation immediately and demanded a resignation that evening or disciplinary proceedings followed by termination proceedings would result. Seacrist wrote a resignation that night and Chief Cusick accepted it. A final check including all benefits owed to Seacrist was received and cashed by him. When Seac-rist found out he did not get the Bayport job, he wrote a letter rescinding his resignation.

## ISSUE

Did Seacrist voluntarily terminate his employment, thereby disqualifying him from unemployment compensation?

## ANALYSIS

■ A person is disqualified from receiving unemployment compensation benefits when "[t]he individual voluntarily and without good cause attributable to the employer discontinued his employment with such employer." Minn.Stat. § 268.09(1)(1) (1982). The question of whether a termination is voluntary or involuntary is determined "not by the immediate cause or motive for the act but by whether the employee directly or indirectly exercised a free-will choice and control as to the performance or non-performance of the act." *Anson v. Fisher Amusement Corp.*, 254 Minn. 93, 98, 93 N.W.2d 815, 819 (1958); *Wing-Piu Chan v. Pagoda, Inc.*, 342 N.W.2d 174, 175 (Minn.Ct.App.1984).

In *Ramirez v. Metro Waste Control Comm'n*, 340 N.W.2d 355 (Minn.Ct.App. 1983), this court faced a similar situation. Ramirez was an employee of Metro Waste. He had been tardy a number of times. After being late yet again, the plant manager told Ramirez that he was going to have him fired. Although Ramirez knew that the plant manager could not fire him directly, he felt from the past actions that the council would follow the manager's recommendation. He resigned so that "it wouldn't look bad on my work record." *Id.* at 356. This court found that:

> [w]hen an employee, in the face of allegations of misconduct, chooses to leave his employment rather than exercise his right to have the allegations determined, such action supports a finding that the employee voluntarily left his job without good cause.

*Id.* at 357 (quoting *Board of County Comm'rs v. Florida Department of Com-*

*merce*, 370 So.2d 1209, 1211 (Fla.Ct.App. 1979).

 Seacrist resigned to protect his employment record for the Bayport job. Because the demand for the resignation was made at night and demanded immediately, he believes that the employer used "overpersuasion." The confrontation was at night because he had arrived for his regular night shift. The Chief had decided that, because of Seacrist's unreliability, he should not be allowed to supervise public welfare. The fact that Seacrist was a candidate for the Bayport job gives more credence to the argument that the termination was voluntary. Resigning was in his best interest to protect his chances for the Bayport job.

Considering Seacrist's job performance and duty to the public, Chief Cusick was justified in seeking immediate disciplinary action and eventual dismissal pursuant to the collective bargaining contract. The Chief was under no duty to allow him the opportunity to resign. Letting Seacrist resign was an act of grace on the Chief's part. Given the choice of discipline, which the record discloses was fully justified, and escaping it by resigning, he freely accepted the escape.

■ Seacrist acted as if the termination was voluntary. His resignation letter was unequivocal. He stated that he had another job. He took his final check with all benefits and cashed it. He never questioned his resignation until his other job did not work out. When an employee says he is quitting, an employer has a right to rely on the employee's word. *Wing-Piu Chan v. Pagoda, Inc.*, 342 N.W.2d 174, 175 (Minn.Ct.App.1984). Seacrist voluntarily quit his job and is therefore disqualified from unemployment benefits.

### DECISION

Seacrist was faced with a choice: discipline which was justified but would jeopardize his chances for another job, or resignation. In his own best interest, he voluntarily chose resignation. The fact that, in the end, he did not get the other job does not make the resignation involuntary. He is disqualified from unemployment benefits because he voluntarily quit his job.

We affirm.