Daniel LAMAH, Relator,

v.

DOHERTY EMPLOYMENT GROUP,
INC., Respondent,

Department of Employment and
Economic Development,
Respondent.

No. A06–1680.

Court of Appeals of Minnesota.

Aug. 28, 2007.

Mary Winston Marrow, Legal Aid Society of Minneapolis, Minneapolis, MN, for relator.

Doherty Employment Group, Inc., Edina, MN, for respondent.

Lee B. Nelson, Linda A. Holmes, Katrina I. Gulstad, Department of Employment and Economic Development, St. Paul, MN, for respondent Department of Employment and Economic Development.

Considered and decided by ROSS, Presiding Judge; SHUMAKER, Judge; and PARKER, Judge.*

## OPINION

ROSS, Judge.

Daniel Lamah challenges an unemployment law judge's decision that he is disqualified from receiving unemployment benefits because he quit a full-time, ongoing work assignment he obtained through Doherty Employment Group, Inc., and no statutory exceptions to the disqualification apply. Lamah contends that he worked a series of one-day assignments through the temporary-staffing agency and that the position was part time. Lamah also asserts that his substantial rights were prejudiced because the unemployment law judge did not appoint an interpreter, rejected offered evidence, and failed to require the employer's representative to submit documentary evidence supporting her testimony. The evidence supports the unemployment law judge's finding that Lamah's work assignment was ongoing. We hold that a person working 32 or more hours a week for an employer is presumptively employed full time. Lamah worked an average of more than 36 hours a week and did not present facts sufficient to rebut this presumption. Because the record also does not support Lamah's contention that his substantial rights were prejudiced, we affirm.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

## FACTS

Daniel Lamah began working full time as a tile setter for Grazzini Brothers & Company in 1998 or 1999. Lamah sought a second job to supplement his income. He applied for work through Doherty Employment Group, Inc., doing business as Doherty Staffing Solutions, in late August 2005. Doherty is a temporary-staffing service. On September 6, through Doherty, Lamah began a work assignment performing packaging work at Northern Star, working Monday through Friday, from 3:00 p.m. to 11:00 p.m. Lamah was instructed to call the Doherty representative at Northern Star each afternoon to ensure that he should report to work. As a newer employee who lacked seniority, Lamah was sometimes released early when Northern Star needed fewer employees. Lamah worked an average of more than 36 hours a week at Northern Star. He last worked for Grazzini Brothers in November 2005 and was formally laid off in early December because Grazzini Brothers had an insufficient amount of work for Lamah.

Near the time of the layoff, Lamah told the Doherty representative at Northern Star that he would be ending his Northern Star work assignment on December 8 because he planned to leave the country for one month. Lamah planned to take his ill child to Africa to be with his recently deported wife. Lamah did not work for Doherty after December 8 but he did not go to Africa because his son's doctors advised against the trip.

The parties dispute the events after Lamah gave his notice and ended his assignment at Northern Star. According to Mary Huffer, Doherty's unemployment insurance administrator, the company's representative at Northern Star closed Lamah's work assignment after he gave notice. Doherty mistakenly called Lamah on December 14 and offered him two new full-time assignments, which he could have started the next day. Lamah declined the work and restated that he was leaving for Africa. After his refusal, Doherty marked his file as inactive, meaning that the company would not call him with future work opportunities. Lamah contends that on December 12 or 13, he notified Doherty that he was available for work. He asserts that for a two-week period, he called daily and was told each time that the company had no work assignments for him and that he should call back the next day. Lamah maintains that after two weeks of daily calls, Doherty told him to call back the following week. After allegedly two weeks of weekly calls, he applied for unemployment benefits. Doherty has no record of Lamah calling.

The Department of Employment and Economic Development found that Lamah did not qualify for unemployment benefits because he voluntarily separated from employment with Doherty. Following a hearing, an unemployment law judge (ULJ) also concluded that Lamah quit his assignment on December 8. The ULJ affirmed her decision after Lamah requested reconsideration. By writ of certiorari, Lamah challenges the ULJ's decision. He argues that he qualifies for unemployment benefits because he did not quit an ongoing assignment and that even if he did, a statutory exception applies because he quit only part-time employment. Lamah also asserts that he was substantially prejudiced at the hearing because the ULJ failed to appoint a necessary interpreter and made erroneous evidentiary decisions.

## ISSUES

I. Did the unemployment law judge err by finding that the relator quit an ongoing work assignment?

II. Is an employee who works an average of more than 36 hours a week employed full time?

III. Did the unemployment law judge prejudice the relator's substantial rights?

## ANALYSIS

A person who quits employment is disqualified from unemployment benefits unless a statutory exception applies. Minn.Stat. § 268.095, subd. 1 (Supp.2005). This court may reverse or modify a ULJ's decision if a petitioner's substantial rights were prejudiced because the ULJ's findings, inferences, conclusions, or decisions are unconstitutional, exceed the department's statutory authority or jurisdiction, are the product of unlawful procedure, are affected by an error of law, are unsupported by substantial evidence in the record, or are arbitrary or capricious. *Id.* § 268.105, subd. 7(d) (Supp.2005). We review the findings in the light most favorable to the decision. *Jenkins v. Am. Express Fin. Corp.*, 721 N.W.2d 286, 289 (Minn.2006). We defer to the ULJ when reviewing credibility and conflicting evidence. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn.App.2006). But we review questions of law de novo. *Scheeler v. Sartell Water Controls, Inc.*, 730 N.W.2d 285, 287 (Minn. App.2007).

### I

We first consider whether Lamah quit his employment. A quit occurs when the employee makes the decision to end employment. Minn.Stat. § 268.095, subd. 2(a) (2004). Determining whether a person who had been employed through a temporary-employment agency qualifies for unemployment benefits requires us to decide first whether the person was employed at the time of the separation and therefore in a position to quit. The supreme court has recognized the unique nature of employment through a temporary-labor service. These businesses are "labor brokers engaged in the business of supplying unskilled labor to local companies for short-term assistance." *Smith v. Employers' Overload Co.*, 314 N.W.2d 220, 222 (Minn.1981). Courts rely on contract principles to determine the nature of the employment relationship. *Id.* at 222–23. The duration of employment depends on the parties' intent. *Id.* at 223.

When addressing qualification for unemployment benefits, courts have applied these principles and distinguished between persons who complete assignments but do not seek new assignments and persons who accept but refuse to complete ongoing assignments.[1] An employee who has completed an assignment but refuses to accept further assignments is not disqualified from unemployment benefits because the employment relationship has ended and the refusal does not constitute a quit. *See id.* (holding that employees who completed four separate one-day assignments intended only one-day employment contracts and qualified for unemployment benefits); *Mbong v. New Horizons Nursing*, 608 N.W.2d 890, 895 (Minn.App.2000) ("Once each assignment is completed, the employment relationship ends because there is neither a guarantee of future assignments nor any employer obligation to provide them."). In contrast, an employee who refuses to complete an accepted assignment quits. *McDonnell v. Anytime Temps.*, 349 N.W.2d 339, 341 (Minn.App.

---

1. Neither party contends that the facts would support application of the definition of a quit under Minnesota Statutes section 268.095, subdivision 2(d), which concerns only temporary staffing-service employees who have been expressly notified in writing of the provision of that subdivision.

1984) (affirming disqualification of woman who worked one day of two-week assignment and refused to complete it); *see also Mbong,* 608 N.W.2d at 895 & n. 2 (recognizing distinction between *Smith* and *McDonnell* ).

■ The record supports the ULJ's finding that Lamah was engaged in an ongoing assignment at Northern Star and his decision to end the assignment constituted a quit on December 8. Lamah argues on appeal that his employment at Northern Star consisted of a series of one-day assignments. But the record does not compel this characterization and instead indicates that Lamah and Northern Star intended the assignment to be ongoing. Lamah accepted a position classified as "temporary to permanent." When asked whether he had one or many assignments through Doherty, he testified, "One." The ULJ followed up, "And the assignment was two months?"[2] Lamah responded, "Yes." Lamah consistently worked from the beginning of his assignment until he quit, about three months. He was paid on alternating weeks rather than daily. *See Smith,* 314 N.W.2d at 222 ("A worker who is hired for a daily job is paid at the end of the workday by the temporary labor service."). Lamah gave advance notice that he would be ending his employment on December 8. These facts all indicate that he considered the assignment to be ongoing. We recognize that Lamah had to call daily to verify his work hours. But the record indicates that the employer had a number of employees, including Lamah, whom it could call upon to work, and calling ahead to confirm the need was part of his ongoing employment duties. Lamah does not contend on appeal that he was ever turned away from work at Northern

Star upon calling in before he announced his departure. We hold that Lamah quit an ongoing work assignment at Northern Star. We therefore turn to whether he was employed full time by Doherty at Northern Star.

**II**

■ Lamah argues that even if he quit employment, a statutory exception applies because he quit only part-time employment. A person who quits part-time employment when he also had full-time employment in the base period, and who separated from the full-time employment because of a nondisqualifying reason, is not disqualified from unemployment benefits. Minn.Stat. § 268.095, subd. 1(5). It is undisputed that Lamah was employed full time by Grazzini Brothers during the base period and that he separated from this employment for a nondisqualifying reason, but the parties dispute whether Lamah's position at Northern Star was part time. *See id.* § 268.035, subd. 4 (2004) (defining base period).

The Minnesota Unemployment Insurance Law does not directly define part-time employment. *See Id.* § 268.035 (2004) (defining terms for purposes of unemployment-insurance law). It does, however, deem a person to be "unemployed" when he performs fewer than "32 hours of service in employment, covered employment, noncovered employment, self-employment, or volunteer work" and earns less in that week than his weekly unemployment benefit amount. *Id.* § 268.035, subd. 26 (Supp.2005). By converse implication, a person performing 32 or more hours of service is employed for the purposes of determining eligibility for benefits. And it would be incongruous to hold

---

**2.** The reference to two months is based on Lamah's initial testimony that his last day at

Northern Star was in November.

that a person employed and performing 32 or more hours of service is engaged only in part-time employment when at the same time he would be considered sufficiently employed to be eligible for "unemployment" benefits if he loses the job.

We also find persuasive the nature of a 1998 statutory amendment to the definition of "unemployed" in chapter 268. Previously, a person was deemed to be "unemployed" when he earns less than his weekly benefit amount "in any week of less than full-time work," and, as we have seen, after the amendment a person was deemed to be "unemployed" when he earns less than his weekly benefit amount "in any week of less than 32 hours of service." *Compare* Minn.Stat. § 268.04, subd. 23 (1996) *with id.* § 268.035, subd. 26 (1998). The amendment essentially replaced the unclear phrase "full time work" with the clear phrase "32 hours of service," leading to the reasonable conclusion that the legislature intended the terms to be synonyms for the purposes of the unemployment law. For the limited purpose of applying the statutory exception of section 268.095, subdivision 1(5), we hold that an employee who performs 32 or more hours of service a week is presumptively employed full time.[3]

We recognize that the supreme court has considered more subjectively that "[p]art-time employment is usually defined as less than the usual number of hours per day for a particular job. However, sporadic or intermittent employment has also been defined as part time." *Zoet v. Benson Hotel Corp.*, 274 N.W.2d 120, 122 (Minn.1978) (citations omitted). But Lamah's reliance on *Zoet* is misplaced for two reasons. First, he does not address the post-*Zoet* statutory amendment to the definition of unemployed, and, second, he does not establish that the subjective assessment directed by the *Zoet* court would compel a determination that he was employed only part time at Doherty while he was assigned at Northern Star.

The court decided *Zoet* 20 years before the legislature amended chapter 268 to deem as employed any claimant working 32 or more hours a week. 1998 Minn. Laws ch. 265, § 4, at 208. The *Zoet* court therefore was not aided, as we are, by the presumptive bright line established in 1998. Because the statute previously determined that an "unemployed" person is one who earns less than his weekly benefit amount while working "less than full time," without defining "full time," it is not surprising that the court at that time directed a more workplace-by-workplace approach to distinguishing full-time from part-time employment. This approach is also rooted in the historic direction of a departmental regulation that defined "full time" in relation to "the number of hours in the calendar week during which individuals engaged in the same or similar occupations in the same establishment usually or customarily perform such services." *Olson v. Starkey*, 259 Minn. 364, 369, 107 N.W.2d 386, 390 (1961) (quoting 1945 regulation of Department of Employment Security).

Despite finding that a presumptive bright line applies, we are aware that

---

**3.** In light of the varying statutory and contractual definitions of "full time," we highlight that this conclusion is not intended to reach beyond the unemployment-benefits arena. *See, e.g.,* Minn.Stat. §§ 116J.874, subd. 1 (defining "full-time employee" as one employed "for at least 35 hours per week" as applied to affirmative-enterprise program), 16A.122, subd. 3 (defining "full-time equivalent position" to mean "2,080 working hours per year" as applied to workforce reporting obligations of state employees), 69.011, subd. 1(g) (defining "full-time" employment as "not less than 30 hours per week" as applied to peace officers qualifying for state aid) (2006).

there is still merit in the historic appreciation that different occupations may require significantly different benchmarks to determine what is full time. In *Zoet*, for example, several banquet servers employed under a union contract applied for unemployment benefits on the ground that they were scheduled to work too few hours. The court held that these workers were part-time employees after considering unique factors of their position. *Zoet*, 274 N.W.2d. at 122. It continues to be that unique employment arrangements, such as those that arise from terms in employment contracts, an unusual number of hours for the work day or work week, or sporadic or intermittent work hours, may create circumstances that are more significant than a baseline number of hours to distinguish full-time from part-time employment. *See id.* So although *Zoet* provides little substantive guidance because it includes no discussion of the number of weekly hours the servers in that case actually worked or the customary number of hours for their position, *Zoet*'s general definition of full time survives despite the amendment, and it provides the basis upon which the hours-based presumption of full-time employment may be overcome.

In this framework, we conclude that the record supports the ULJ's finding that Lamah's employment was full time. Huffer testified that Lamah worked an average of more than 36 hours each week at Northern Star and that only during two weeks did he work fewer than 32 hours, one of which was a partial work week when he began his employment. Lamah's testimony differed significantly. He claimed he worked an average of 20 to 22 hours a week, working as few as 8 hours a week and never working 40 hours a week. He also asserted that he received no work some weeks. But the ULJ was in the best position to assess credibility and weigh the evidence, and we will not second-guess those judgments. *Skarhus*, 721 N.W.2d at 344.

Additionally, evidence that Lamah submitted with his request for reconsideration supported Huffer's testimony and contradicted his own, further supporting the ULJ's finding. Lamah presented a table comparing his weekly averages worked at Grazzini Brothers with those he worked at Northern Star in 2005 to demonstrate that his Northern Star employment was part time. But the comparison is misleading because the data he relies on are flawed. When corrected, the table supports the department's position. The table indicates that Lamah worked an average of 40.45 hours a week at Grazzini Brothers. But the first entry in the table reflects that Lamah worked 185 hours that week, an impossible feat because there are only 168 hours in any week. Excluding this erroneous data point, Lamah's weekly average at Grazzini Brothers was 36.93 hours. The same table reflects a weekly average of 36.35 hours worked at Northern Star. Relying on his employment at Grazzini Brothers to establish that he worked full time during the base period, Lamah cannot persuasively argue that the reduction of approximately 35 fewer minutes per week he worked at Northern Star requires the ULJ to construe his employment there as merely part time.

Applying the *Zoet* factors also supports the ULJ's findings and demonstrates that Lamah did not rebut the presumption. Lamah worked the same eight-hour shift, five days a week, for more than three months. Although he sometimes was sent home early because of relaxed workload demands, this was the exception, and testimony indicated that other workers in the position faced the same possibility, demonstrating that the customary number of hours each day for the position would generally be eight hours, subject, occasionally,

to modest subtraction. Lamah's weekly average of 36.35 hours worked at Northern Star fits this arrangement and was not part time.

Lamah also asserts that the employment he quit was unsuitable employment because he is a skilled tile setter and the Northern Star position required unskilled labor. A person may still qualify for unemployment benefits if he quits employment within 30 days after starting the employment because the employment was unsuitable. Minn.Stat. § 268.095, subd. 1(3) (Supp.2005). This exception does not apply here. Lamah's argument hinges on his assertion that he worked only one-day assignments. Yet, if this were valid, the exception would not be triggered because once he completed the assignment he would not have employment to quit. Because Lamah worked an ongoing assignment and quit well after 30 days of starting, whether the position was unsuitable under subdivision 1(3) is irrelevant to whether Lamah qualifies for unemployment benefits. This leaves Lamah's due process challenges.

### III

█ Lamah raises two challenges to the manner in which the ULJ conducted the hearing. He argues that the ULJ failed to provide him with an interpreter, and that the ULJ rejected evidence that he submitted while permitting Huffer to testify on behalf of Doherty without firsthand knowledge or supporting, documentary evidence. The record does not support Lamah's demand for a reversal or remand.

Lamah asserts that he was unable to participate meaningfully at the hearing because English is not his primary language, claiming that he and the ULJ experienced significant communication difficulties. The department is required to provide an interpreter "when necessary, upon the request of a party." Minn. R. 3310.2911 (2005). If a party does not request an interpreter, the ULJ must "continue any hearing where a witness or principal party in interest is a handicapped person so that an interpreter can be appointed." *Id.; see also* Minn.Stat. § 546.42 (2004) (defining handicapped in communication to include person who has difficulty speaking or comprehending English and is unable to fully understand proceeding in which person is required to participate).

Lamah never requested an interpreter. He acknowledged receiving materials before the hearing, which included a document stating, "This and the accompanying documents are important. If the reader does not understand the documents, the reader should seek immediate assistance." He told the ULJ that he had read the materials. At the outset of the hearing, the ULJ told Lamah to advise her if he lacked understanding. The hearing transcript does not reveal significant communication problems that should have caused the ULJ to continue the hearing sua sponte and appoint an interpreter for Lamah. Lamah quotes isolated sections of the transcript as evidence of communication problems. But reading the transcript as a whole indicates that Lamah understood the questions asked and that he understood the proceeding. His answers were congruent with the ULJ's questions and he never stated that he did not understand.

Although the ULJ asked Lamah several times for clarification, the requests primarily regarded substantive matters because he frequently contradicted himself. To the extent that communication problems are reflected in the transcript, they are limited to those that are common in unemployment-benefits hearings. For example, Lamah frequently went off-topic by focusing on why he started a second job and why he

needs benefits, rather than limiting his answers to the questions asked. In an affidavit accompanying his request for reconsideration, Lamah contended that partway through the hearing, he was frustrated and "stopped trying to explain things and simply answered, 'yes' or 'no' to the judge's questions." But these responses were given to yes-or-no questions.

Lamah's argument that communication problems are demonstrated by the ULJ's failure to assist him in formulating his questions to Huffer is also unsupported; Lamah asked Huffer two yes-or-no questions, both intelligible, and she answered them. The record supports the ULJ's finding that any communication problems were immaterial and did not result in misinterpretation of Lamah's statements or erroneous fact findings. *See Ywsuf v. Teleplan Wireless Servs., Inc.,* 726 N.W.2d 525, 530 (Minn.App.2007) (finding relator's substantial rights were not prejudiced when she did not request interpreter, record did not indicate she did not understand the proceedings or that ULJ did not understand her, and transcript showed she made claims and assertions clear).

■ Lamah's evidentiary challenges are also without support. All competent, relevant, and material evidence offered is to be admitted as part of the hearing record. Minn. R. 3310.2922 (2005). The ULJ may receive any probative evidence, including hearsay, and may exclude evidence that is irrelevant, immaterial, unreliable, or unduly repetitious. *Id.* A party must provide the opposing party with a copy of any document or exhibit accepted into evidence if requested. *Id.* 3310.2921 (2005).

Lamah introduced to the ULJ his 2005 W–2 and a letter from his mortgage-service center. But he had not sent a copy of these documents to Doherty before the telephonic hearing. He acknowledged reading the prehearing materials directing him to send Doherty a copy of any evidence he intended to submit, but stated that he chose not to because he "do[es] not have respect for them." The ULJ declined to admit the letter. But she admitted the W–2 because Huffer waived her right to have a copy and the ULJ noted that the document was one Doherty should have in its possession. Lamah's argument that the ULJ erred by excluding the W–2 therefore lacks a factual basis. And he does not argue that the ULJ should have admitted the irrelevant mortgage-service-center letter.

Finally, Lamah was not prejudiced by Huffer's testimony. He asserts that the ULJ should have required Doherty to present documentary evidence or witnesses with firsthand knowledge to support her testimony. But it is unclear what additional evidence or testimony he believes would have been necessary. Lamah's claim for benefits involves two inquiries: whether he quit his job on December 8 and whether his assignment at Northern Star was part time. Although Huffer did not personally know Lamah, Huffer was a representative of Doherty and testified to basic facts concerning Lamah's employment, such as his start and end dates and the number of hours he worked each week. These facts did not require presentation by any specific person at Doherty. Evidence that Lamah submitted with his request for reconsideration supported Huffer's testimony and contradicted his testimony on these points, and Lamah does not challenge the veracity of this basic information. Although Huffer also testified about calls made by another employee to Lamah, the hearsay restrictions in the rules of evidence do not apply to unemployment-benefits hearings. Minn. R. 3310.2922 (providing that ULJ is not bound by statutory and common law rules of evidence); *see also Jenkins,* 721

N.W.2d at 288 n. 1. ("Reflecting the expedited nature of unemployment benefit proceedings, the applicable rules anticipate the need to consider all of the circumstances of an employee's departure in reaching unemployment benefits qualification determinations, and specifically allow hearsay evidence in keeping with that goal."). Additionally, this testimony related to background events occurring after Lamah quit and does not bear on the issues of whether he quit and whether his assignment was part time.

## DECISION

Lamah quit an ongoing, full-time work assignment on December 8, and the ULJ conducted a fair hearing. No statutory exception applies to Lamah's disqualification from unemployment benefits.

**Affirmed.**