*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A13-2151

Michael Robin,
Relator,

vs.

BHSI LLC,
Respondent,

Department of Employment and
Economic Development,
Respondent.

**Filed July 28, 2014**
**Affirmed**
**Johnson, Judge**

Department of Employment and
Economic Development
File No. 31379642-3

Michael Robin, St. Paul, Minnesota (*pro se* relator)

BHSI LLC, North St. Paul, Minnesota (respondent)

Lee B. Nelson, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

Considered and decided by Rodenberg, Presiding Judge; Johnson, Judge; and Chutich, Judge.

UNPUBLISHED OPINION

**JOHNSON**, Judge

Michael Robin sought unemployment benefits, but the department of employment and economic development determined that he is ineligible because he quit his employment without a good reason caused by his employer. After Robin filed an administrative appeal, an unemployment-law judge upheld the ineligibility determination and denied Robin's request for reconsideration based on newly discovered evidence. We affirm.

**FACTS**

Robin was employed as a psychotherapist by BHSI, a company that provides mental-health counseling services in the metro area, starting in August 2009. In May 2013, he received a letter from the Board of Social Work stating that one of his former patients had filed a complaint against him. Robin shared the letter with Susan Arquette, a co-owner and manager of BHSI. Shortly thereafter, Robin asked Arquette whether BHSI's insurance policy would cover the expenses of retaining an attorney to defend against the complaint. Arquette told Robin that BHSI's insurance policy would cover such expenses but that she was unsure of the coverage limits.

On June 11, 2013, Robin and Arquette met again to discuss the complaint. Robin had learned that his own insurance policy would cover the expenses of an attorney but would provide reimbursement only upon resolution of the complaint. Robin expressed concern about his ability to pay the attorney fees prior to a resolution of the complaint. Arquette told Robin that she had recently learned from one of her business partners that

BHSI's insurance policy would *not* cover the expenses of defending against the complaint. Arquette also told Robin that she had learned that another patient was planning to file a complaint against him. Robin became upset. He talked about quitting. Arquette later testified that Robin clearly said he had quit. Robin disputed that version, testifying that he said only, "I might as well resign," or words to that effect. Robin also told Arquette to cancel his appointments. Arquette suggested that Robin take a few days to think about the matter and asked him to provide her with a written notice of his resignation. Robin left the meeting without saying anything further.

Robin did not appear for work the next day. He attempted to reach Arquette several times by telephone. When he reached her by telephone at the end of the day, Arquette told Robin that BHSI had accepted his resignation. Robin said that he did not want to resign. Arquette replied that it was too late. BHSI sent Robin a letter that same day confirming that it had accepted his resignation.

Robin applied for unemployment benefits. The department initially determined that he is ineligible. Robin filed an administrative appeal. In August 2013, an unemployment-law judge (ULJ) held an evidentiary hearing and upheld the initial determination of ineligibility on the ground that Robin quit without a good reason caused by BHSI. The ULJ based her decision on Arquette's testimony that Robin quit during the June 11 meeting.

After the ULJ issued her written decision, Robin learned from his attorney that BHSI's insurance policy actually did provide coverage for the expenses of defending against the complaint. In September 2013, Robin requested reconsideration and asked

the ULJ to grant an additional evidentiary hearing so that he could present the newly discovered evidence. In October 2013, the ULJ denied Robin's request for reconsideration and affirmed her prior ruling. Robin appeals by way of a petition for a writ of certiorari.

## DECISION

Robin's 45-page *pro se* brief makes numerous arguments that are beyond the scope of this court's review. We will confine ourselves to the arguments that relate to the question whether Robin is eligible for unemployment benefits. *See* Minn. Stat. § 268.105, subd. 7(d) (2012).

## I.

Robin first argues that the ULJ erred in her August 2013 decision by finding that he is ineligible for unemployment benefits because he quit his employment without a good reason caused by his employer.

This court reviews a ULJ's decision denying benefits to determine whether the findings, inferences, conclusions, or decision are affected by an error of law, are unsupported by substantial evidence in view of the entire record, or are arbitrary or capricious. *Id.* The ULJ's factual findings are viewed in the light most favorable to the decision being reviewed, and this court defers to the ULJ's credibility determinations. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006).

Generally, an employee is ineligible for unemployment benefits if he quits his employment. Minn. Stat. 268.095, subd. 1 (2012). A quit occurs "when the decision to end the employment was, at the time the employment ended, the employee's." *Id.*,

4

subd. 2(a). On the other hand, a discharge occurs when "any words or actions by an employer would lead a reasonable employee to believe that the employer will no longer allow the employee to work for the employer in any capacity." *Id.*, subd. 5(a). If an employee provides notice of an intention to quit, and the employer does not allow the employee to work the entire notice period, the employee is deemed to have been discharged. *Id.*, subd. 5(b).

Whether an employee voluntarily quit or was discharged is a question of fact. *Stassen v. Lone Mountain Truck Leasing, LLC*, 814 N.W.2d 25, 31 (Minn. App. 2012). This court defers to a ULJ's finding of fact so long as there is substantial evidence to support the finding. *Stagg v. Vintage Place*, 796 N.W.2d 312, 315 (Minn. 2011). "Substantial evidence" is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Dourney v. CMAK Corp.*, 796 N.W.2d 537, 539 (Minn. App. 2011).

## A.

Robin contends that, for three reasons, he did not actually quit his employment but, rather, was discharged.

Robin contends that he did not quit because he withdrew his resignation by telephone on June 12. For purposes of unemployment benefits, an employee may not withdraw a resignation unless the employer agrees that the resignation may be withdrawn. 2014 Minn. Laws ch. 251, art. 2, § 14 (to be codified at Minn. Stat. § 268.095, subd. 2(c) (2014)). If the employer does not agree, the resignation is deemed to be a quit. *Id.* Thus, Robin did not effectively withdraw his resignation.

5

Robin also contends that he did not quit because he did not submit written notice of his resignation, as Arquette had requested. But Robin's resignation was effective even without written notice because, as the ULJ found, Robin effectively communicated to Arquette that he was quitting. Robin was asked to submit something in writing only after he said that he had already quit. There was no agreement that his resignation would be effective only if he submitted a written notice.

Robin further contends that he did not quit because he was discharged pursuant to section 268.095, subdivision 5(b), when Arquette did not allow him to work after he had announced his resignation. Robin did not preserve this argument by making it in his request for reconsideration. *See Peterson v. Northeast Bank*, 805 N.W.2d 878, 883 (Minn. App. 2011) (citing *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988)). Nonetheless, the contention lacks merit. Section 268.095, subdivision 5(b), applies only if an employee provides advance notice of an intention to quit in the future. Robin did not give notice of an intention to quit in the future; he quit on the spot. Thus, Robin may not rely on section 268.095, subdivision 5(b).

**B.**

Robin also contends that, even if he quit, his decision to quit was not voluntary because of his "distraught, terrified, and . . . suicidal state of mind." Whether a quit is voluntary is determined by "whether the employee directly or indirectly exercised a free-will choice and control as to the performance or non-performance of the act." *Seacrist v. City of Cottage Grove*, 344 N.W.2d 889, 891 (Minn. App. 1984) (quotation omitted). Generally, a person has the capacity to voluntarily perform an act if he understands the

6

nature and effect of the act. *See, e.g.*, *Parrish v. Peoples*, 214 Minn. 589, 597, 9 N.W.2d 225, 229 (1943) (discussing capacity in context of probate law); *Fischer v. Shefers*, 656 N.W.2d 592, 595-96 (Minn. App. 2003) (discussing capacity in context of contract law). Whether an employee quit voluntarily is a question of fact for the ULJ. *Stassen*, 814 N.W.2d at 31.

The ULJ found that Robin had the capacity to decide to quit his employment, even though he was upset during the June 11 meeting. The ULJ's finding is supported by substantial evidence. Arquette testified that Robin was upset but not extremely so. Robin did not testify that he was unable to control his actions or to understand the effect of telling Arquette that he quit. Thus, the ULJ did not err by concluding that Robin had the capacity to quit his employment.

## C.

Robin further contends that, even if he quit, he did so for a good reason caused by BHSI. Despite the general rule that an employee who quits employment is ineligible for unemployment benefits, Minn. Stat. § 268.095, subd. 1, an employee is eligible for benefits if the employee quit "because of a good reason caused by the employer," *id.*, subd. 1(1). A good reason caused by the employer is a reason "(1) that is directly related to the employment and for which the employer is responsible; (2) that is adverse to the worker; and (3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." *Id.*, subd. 3(a). These three requirements "must be applied to the specific facts of each case." *Id.*, subd. 3(b). An employee subject to "adverse working conditions . . . must complain to the employer and

7

give the employer a reasonable opportunity to correct the adverse working conditions before that may be considered a good reason caused by the employer for quitting." *Id.*, subd. 3(c). An employee's reason for quitting is an issue of fact, and a finding of fact on that issue cannot be overturned "if the evidence reasonably tends to sustain" it. *Peppi v. Phyllis Wheatley Cmty. Ctr.*, 614 N.W.2d 750, 752 (Minn. App. 2000). But if the relevant facts are undisputed, whether a reason to quit meets the statutory standard of "a good reason caused by the employer" is a question of law, to which this court applies a *de novo* standard of review. *Id.*

The ULJ concluded that Robin quit for four reasons: "because he was worried about paying for an attorney to defend his license, he thought there was a second board complaint, he was upset about his understanding of the employer's insurance policy, and he was concerned he may be discharged." None of these reasons would compel an average worker to quit and become unemployed rather than remaining employed. *See* Minn. Stat. § 268.095, subd. 3(b). The first three reasons are not good reasons because there was no apparent benefit in quitting; the record does not reveal any reason why Robin's concerns would cease to exist after he quit. The fourth reason is not a good reason because a reasonable employee would "exercise his right to have the allegations determined." *See Seacrist*, 344 N.W.2d at 891 (concluding quit voluntary where employee quit rather than face employer's accusation of misconduct). Thus, the ULJ did not err by concluding that Robin did not quit for a good reason caused by BHSI.

In sum, the ULJ properly determined, based on the record created at the August 13 evidentiary hearing, that Robin is not eligible for unemployment benefits.

8

## II.

Robin also argues that the ULJ erred in her September 2013 decision by not granting him an additional evidentiary hearing so that he could present newly discovered evidence that BHSI's insurance policy provided coverage for the expenses of defending against the patient's complaint.

In deciding whether to grant a request for reconsideration, a ULJ initially considers newly discovered evidence only for the purpose of determining whether an additional evidentiary hearing is necessary. Minn. Stat. § 268.105, subd. 2(c). A ULJ must order an additional evidentiary hearing if the new evidence "(1) would likely change the outcome of the decision and there was good cause for not having previously submitted that evidence; or (2) would show that the evidence that was submitted at the hearing was likely false and that the likely false evidence had an effect on the outcome of the decision." *Id.* "This court will not reverse a ULJ's decision to deny an additional evidentiary hearing unless the decision constitutes an abuse of discretion." *Kelly v. Ambassador Press, Inc.*, 792 N.W.2d 103, 104 (Minn. App. 2010). "But the ULJ's discretion is not absolute; the discretion must be exercised within the statutory requirements." *Vasseei v. Schmitty & Sons Sch. Buses Inc.*, 793 N.W.2d 747, 750 (Minn. App. 2010).

In this case, the ULJ determined that Robin satisfied the second part of the first requirement because he had good cause for not presenting evidence of BHSI's insurance policy, which was not available to him until after the evidentiary hearing. *See* Minn. Stat. § 268.105, subd. 2(c)(1). The ULJ also determined that Robin satisfied the first part of

9

the second requirement because Arquette's testimony concerning the scope of coverage available under BHSI's insurance policy turned out to be false. *See id.*, subd. 2(c)(2). But the ULJ determined that Robin did not satisfy the first part of the first requirement or the second part of the second requirement because Arquette's false testimony did not have "an effect on the outcome of the decision" and was unlikely to "change the outcome of the decision." *See id.*, subd. 2(c)(1), (2).

## A.

Robin contends that the newly discovered evidence had an effect on the outcome of the administrative appeal, and likely would change the outcome after an additional evidentiary hearing, for three reasons.

First, Robin contends that the new evidence would cause the ULJ to change her view of Arquette's credibility. The ULJ expressly found Arquette to be a credible witness, even after considering the new evidence concerning BHSI's insurance policy. The ULJ reasoned that there is no evidence that Arquette knew the actual terms of the policy and intentionally gave false testimony on the issue. "Credibility determinations are the exclusive province of the ULJ and will not be disturbed on appeal." *Skarhus*, 721 N.W.2d at 345. Thus, we cannot say that the ULJ committed reversible error by not changing her determination concerning Arquette's credibility.

## B.

Robin also contends that the new evidence concerning BHSI's insurance policy would show that he had a good reason to quit caused by the employer. As stated above, there is no reason to believe that quitting improved Robin's situation. Accordingly, even

10

with more-accurate information about the scope of insurance coverage, a reasonable person in Robin's position would not decide to quit employment. *See* 268.095, subd. 3(b). Thus, the ULJ did not abuse her discretion by concluding that the new evidence would not change her decision that Robin did not quit for a good reason caused by BHSI.

## III.

Robin last argues that an additional evidentiary hearing is necessary because the ULJ did not provide him with a fair hearing.

Whether a ULJ provided a fair hearing hinges on whether the ULJ "exercise[d] control over the hearing procedure in a manner that protects the parties' rights to a fair hearing." *Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 529 (Minn. App. 2007) (quotation omitted). The focus is on whether some unlawful procedure or error of law prejudiced a relator. *See, e.g.*, *Stassen*, 814 N.W.2d at 31-32; *Marn v. Fairview Pharmacy Servs. LLC*, 756 N.W.2d 117, 122 (Minn. App. 2008), *review denied* (Minn. Dec. 16, 2008); *Ywswf*, 726 N.W.2d at 529-30.

Robin contends that the ULJ erred by denying his request to subpoena Arquette's business partners. Robin first requested the subpoenas in his request for reconsideration. The statute on which he relies applies only to evidentiary hearings, not to requests for reconsideration. *See* Minn. Stat. § 268.105, subd. 1(b). Thus, his contention is without merit.

Robin also contends that the hearing was unfair because the ULJ relied on hearsay when Arquette testified that her business partners told her that BHSI's insurance policy

11

provided coverage for the expenses of defending against the patient's complaint. Robin did not raise this issue in his request for reconsideration. *See Peterson*, 805 N.W.2d at 883. In any event, a ULJ may receive "any evidence that possesses probative value, including hearsay." Minn. R. 3310.2922 (2013); *see also Lamah v. Doherty Emp't. Grp., Inc.*, 737 N.W.2d 595, 603 (Minn. App. 2007).

Robin further contends that the ULJ exhibited bias by crediting Arquette's testimony instead of his own testimony. The ULJ has an obligation to make credibility determinations when confronted with conflicting evidence. *See* 2014 Minn. Laws ch. 251, art. 2, § 15 (to be codified at Minn. Stat. § 268.105, subd. 1(d) (2014)). There is no indication of bias in the record.

In sum, the ULJ did not err by determining that Robin did not quit his employment for a good reason caused by the employer, by denying Robin's request for an additional evidentiary hearing, or by the manner in which she conducted the evidentiary hearing.

**Affirmed.**