*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2342**


Frederick Wright,
Relator,

vs.

Atterro, Inc.,
Respondent,

Department of Employment and Economic Development,
Respondent.


**Filed August 18, 2014
Reversed
Halbrooks, Judge**


Department of Employment and Economic Development
File No. 31470761-3

Peter B. Knapp, Joshua M. Erspamer (certified student attorney), William Mitchell Law Clinic, St. Paul, Minnesota (for relator)

Atterro, Inc., Minneapolis, Minnesota (respondent)

Lee B. Nelson, Minnesota Department of Employment and Economic Development, St. Paul, Minnesota (for respondent Department of Employment and Economic Development)

Considered and decided by Halbrooks, Presiding Judge; Hudson, Judge; and Reilly, Judge.

UNPUBLISHED OPINION

**HALBROOKS**, Judge

Relator challenges the decision of an unemployment-law judge (ULJ) that he is ineligible to receive unemployment benefits, resulting in an overpayment of benefits in the amount of $2,304. Because the ULJ's determination that relator quit his employment due to management concerns is not supported by the evidence in the record, we reverse.

## FACTS

Relator Frederick Wright was employed by respondent Atterro Inc., d/b/a Prostaff Personnel Services (Prostaff), a temporary-staffing-service agency that assigns its employees to companies seeking short-term or temporary staff. From January 2012 to July 2013, Prostaff assigned Wright to work as a material handler for Datacard. It is undisputed that Wright was a good employee and well-liked at Datacard, which resulted in Datacard offering Wright a position of permanent employment. Wright accepted the offer, and his employment was to transfer from Prostaff to Datacard on July 22, 2013.

From July 15 to 18, 2013, Wright did not appear for his scheduled shifts at Datacard. Due to his absences, Datacard rescinded its offer of permanent employment. Wright contacted Prostaff about his absences at Datacard, and from July 18 to 23 his employment at both facilities was "in limbo." On July 23, Wright sought unemployment benefits from respondent Minnesota Department of Employment and Economic Development (DEED). DEED determined that Wright was eligible for unemployment benefits because he had completed a temporary work assignment at Prostaff and requested additional work within five days of completing the assignment. Prostaff

appealed DEED's determination of eligibility, asserting that Wright should not receive unemployment benefits because he failed to attend work and did not provide proper notice to his employer.

On September 4, 2013, the ULJ conducted a telephone hearing to determine if Wright was eligible to receive unemployment benefits. Stephanie Hammer, a talent manager at Prostaff, appeared on its behalf; Wright appeared pro se. Hammer testified that Wright's assignment at Datacard ended because he failed to attend work and did not notify either Datacard or Prostaff that he would be absent until July 18. Hammer further claimed that Wright missed work "because . . . he was drinking on Friday night [July 12] and spent a lot of money," and that he was "ashamed of the situation so he'[d] been staying in his apartment ever since." Hammer claimed that sometime during July 18 to 23, when Wright's employment at Datacard and Prostaff was "in limbo," she spoke with managers at Datacard, who agreed to reemploy Wright temporarily "because they really liked him as an employee." Hammer contended that on July 23, Wright was informed of Datacard's decision to reemploy him. She testified that, in her absence, another Prostaff employee, Becca, spoke to Wright. According to Hammer, Wright told Becca that he was not willing to return to Datacard because he had concerns about Datacard's management.

At the hearing, Wright denied that his absences were due to drinking alcohol, insisting that he had missed work because of stomach pain caused by ulcers. Wright testified that he notified his employers that he would be absent from July 15 to 18, contacting them before his scheduled shift each day. With regard to the July 23

3

telephone conversation, Wright stated that Becca informed him that Prostaff had decided to keep him as an employee but that she said nothing about reassigning him to temporary work at Datacard. Wright stated that eight or nine months earlier, he may have voiced concerns about his job security at Datacard because of a new manager, but any past concerns he may have had would not have prevented him from working at Datacard.

Before the telephone hearing concluded, Wright's cell-phone battery died, and he was disconnected. The ULJ attempted to call Wright back, but was unsuccessful. The ULJ subsequently proceeded to question Hammer for another seven minutes. Due to the timing of the disconnection, Wright did not have an opportunity to cross-examine Hammer.

The day after the hearing, the ULJ issued an order determining that Wright is ineligible for unemployment benefits because he quit his employment at Prostaff without good cause. The ULJ found that Wright went out drinking and spent a substantial amount of money on July 12, failed to attend work "because he was not feeling well and was embarrassed about his drinking and spending," and failed to call Prostaff or Datacard to report that he would be absent. The ULJ also found that on July 23, "Wright indicated he was not willing to return to Datacard because he had concerns about the Datacard managers." By the date of the ULJ's order, Wright had been overpaid $2,304 in unemployment benefits.

Wright filed a request for reconsideration, challenging the ULJ's determination that he quit his employment. With his request, Wright submitted his cell-phone records indicating that he had called either Datacard or Prostaff on the dates he was absent from

4

work.  Wright also noted that he had worked at Datacard on Saturday, July 13, the day after he had allegedly been drinking.  Finally, Wright alleged that the ULJ had improperly participated in ex parte communication when the ULJ continued the telephone hearing after Wright was disconnected.  The ULJ affirmed the earlier determination, concluding that even if Wright had called his employers on the dates in question, "the ultimate issue was the final conversation Wright had with Prostaff on July 23, 2013," and Wright's cell-phone records did not clarify what was said during that conversation.  The ULJ concluded that Hammer's testimony was more credible with regard to what was said between Wright and Becca on that date.  The ULJ further concluded that it had not engaged in ex parte communication.  This appeal follows.

## D E C I S I O N

Wright challenges the ULJ's determination that he quit his employment at Prostaff.  On review, this court may affirm a ULJ's decision, remand for further proceedings, or reverse if the substantial rights of the relator are prejudiced because the findings, inferences, conclusion, or decision are

> (1) in violation of constitutional provisions;
> (2) in excess of the statutory authority or jurisdiction
> of the department;
> (3) made upon unlawful procedure;
> (4) affected by other error of law;
> (5) unsupported by substantial evidence in view of the
> entire record as submitted; or
> (6) arbitrary or capricious.

2014 Minn. Laws ch. 271, art. 1, § 1 (to be codified at Minn. Stat. § 268.105, subd. 7(d) (2014)).

The ULJ determined that Wright quit his employment because of his concerns about the management at Datacard. When addressing why Wright did not have good cause to quit his employment, the ULJ reasoned that

> [t]here are no specific concerns on the record and Prostaff was never told of any specific concerns Wright had. There is no evidence to show that Wright's concerns would compel and [sic] average, reasonable worker to quit and become unemployed rather than remaining in the employment. Further, Wright was willing to accept the Datacard job offer shortly before he quit. Wright did not quit for a good reason caused by the employer under the Minnesota unemployment insurance law.

We conclude that the ULJ's finding that Wright quit his employment is unsupported by substantial evidence in the record. Wright testified that he would have accepted a temporary assignment at Datacard. And as the ULJ noted, there are "no specific concerns on the record" relating to any problems Wright had with Datacard's management. The record establishes that Wright was well-liked at Datacard. And Hammer testified that Datacard agreed to reemploy Wright "because they really liked him as an employee." Hammer stated that she "knew how good of a worker he was at Data[c]ard and [she] liked working with him." In addition, it is undisputed that Datacard offered Wright permanent employment shortly before his absences occurred, and Wright accepted Datacard's offer. The ULJ's conclusion that Wright quit because of his concerns about the management at Datacard is inherently inconsistent with the ULJ's finding, and the record's support, of Wright's acceptance of permanent employment with Datacard shortly before his absences occurred.

6

The only evidence that supports the ULJ's conclusion that Wright had concerns about Datacard's management is Hammer's hearsay testimony speculating as to what was said between Wright and Becca on July 23. Hearsay is admissible in unemployment-benefit hearings. Minn. R. 3310.2922 (2013). But "[w]hen the credibility of a witness testifying in a hearing has a significant effect on the outcome of a decision, the [ULJ] must set out the reason for crediting or discrediting that testimony." 2014 Minn. Laws ch. 251, art. 2, § 15 (to be codified at Minn. Stat. § 268.105, subd. 1(d) (2014)). Further, the ULJ's credibility determination must be supported by substantial evidence. *Wichmann v. Travalia & U.S. Directives, Inc.*, 729 N.W.2d 23, 29 (Minn. App. 2007). Here, the ULJ found that "Hammer's testimony was more credible than Wright's testimony because it was more detailed, specific, followed a more logical chain of events and was more reasonable under the circumstances." This finding is not supported by the record.

At the beginning of the hearing, Hammer implied that she was the one who informed Wright on July 23 that he would be reassigned to Datacard. Near the end of the hearing, after Wright's cell phone had been disconnected, Hammer clarified that she was out of the office when the July 23 call took place. Even the ULJ expressed his surprise when Hammer stated that she was relying on notes written by Becca for her testimony.

> Q       Okay.    And, Ms. Hammer, Mr. Wright is also
>         contending that when you talked to him sometime on
>         around the 23rd . . . you only told him that you would
>         keep him as a Prostaff [employee] for short term
>         assignments but not at Data[c]ard, do you agree with
>         that?

7

A       I do not. I could see I did say that if he didn't choose Data[c]ard we would only do short term because his reliability was obviously questionable to us. So we would have him do short term assignments to build up his credibility with Prostaff again. I could see where he got that. But he was offered a chance to go back to Data[c]ard.

Q       Do you believe you were clear on that during the conversation?

A       Yes. And I know my co-worker Becca told him that as well because she's the one who spoke to him when he declined.

Q       Oh, I see. Okay. So . . .

A       Yeah. She took the call. I was out of the office.

Q       Oh, so you're just looking at notes as to where that Becca talked to him?

A       Yup.

Hammer claimed that Wright was a well-liked employee who had recently accepted Datacard's offer of full-time employment. She then claimed that, although Wright had never mentioned any problems before, he suddenly refused to work at Datacard because of his concerns about their management. On this record, we cannot affirm the ULJ's determination that Hammer's testimony followed a "more logical chain of events" or that it was "more reasonable under the circumstances."

Finally, the procedure implemented in administering Wright's case warrants reversal of the ULJ's ineligibility determination. During the telephone hearing, Hammer made serious allegations relating to Wright's alcohol use. She also testified that the reason Wright's employment ended was because he failed to notify his employers that he would be absent. Due to the unfortunate disconnection of Wright's cell phone, Wright was unable to cross-examine Hammer. A large portion of the ULJ's initial ineligibility determination discussed Wright's alleged intoxication and the events surrounding July 15

to 18. But the ULJ's factual findings relating to the events from July 15 to 18 were shown to be clearly erroneous after Wright submitted his request for reconsideration. With his request for reconsideration, Wright included his cell-phone records establishing that he called either Datacard or Prostaff on the dates that he was absent. Additionally, in his request for reconsideration, Wright asserted that he worked at Datacard for five hours on Saturday, July 13. This again refutes the ULJ's findings that "Wright did not go to work because he was not feeling well and was embarrassed about his drinking and spending."

In this case, we conclude that the ULJ improperly refused to order another hearing. *See* 2014 Minn. Laws ch. 251, art. 2, § 16 (to be codified at Minn. Stat § 268.105, subd. 2(c) (2014)) (stating that a ULJ must order an additional hearing if a party shows that evidence not submitted at the initial hearing would likely change the outcome of the decision or show that evidence at the initial hearing was likely false). Additionally, the ULJ failed to discuss or inquire as to whether Wright had quit his employment as described in 2014 Minn. Laws ch. 251, art. 1, § 14 (to be codified at Minn. Stat. § 268.095, subd. 2(d) (2014)), the provision governing when employees who work at a staffing-service agency "quit" their employment. Failure to consider that Wright was employed at a staffing-service agency may have further prejudiced Wright. *See Lamah v. Doherty Emp't Grp., Inc.*, 737 N.W.2d 595, 598 (Minn. App. 2007) ("An employee who has completed an assignment but refuses to accept further assignments is not disqualified from unemployment benefits because the employment relationship has ended and the refusal does not constitute a quit.").

Viewing the record as a whole, we conclude that Wright's substantial rights were prejudiced.  The lack of evidence to support the ULJ's finding that Wright quit his employment and the manner in which Wright's claims were handled warrants reversal of the ULJ's ineligibility determination.  Because we reverse on this basis, we need not address the issue of whether the ULJ engaged in ex parte communication by continuing the telephone hearing after Wright's cell phone became disconnected.

**Reversed.**